UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| In re | Chapter 11 |
| --- | --- |
| XINYUAN REAL ESTATE CO., LTD., | Case No. 25-10745-pb |
| Alleged Debtor. | |

**DECLARATION OF BEN HOBDEN IN SUPPORT OF MOTION OF XINYUAN REAL ESTATE CO., LTD. FOR AN ORDER EXTENDING ITS TIME TO ANSWER OR MOVE AGAINST THE INVOLUNTARY PETITION**

I, BEN HOBDEN, hereby declare under penalty of perjury under the laws of the United States of America.

1. I am an Attorney-at-Law of the Grand Court of the Cayman Islands. I practise law as a partner of Harney Westwood & Riegels (Cayman) LLP ("Harneys"), a Cayman Islands-registered law firm located at 3rd Floor, Harbour Place, 103 South Church Street, PO Box 11088, KY1-1008, Cayman Islands, and act as Cayman Islands counsel to Xinyuan Real Estate Co., Ltd. ("Xinyuan" or the "Company").

2. I am a member of good standing of the Cayman Islands Bar and there are no disciplinary proceedings pending against me. I am informed that on April 14, 2025, Cithara Global Multi-Strategy SPC - Bosideng Industry Investment Fund SP, Star Freight & Trading Co., Limited, and Mars Partner Limited (collectively, the "Petitioning Creditors") filed an involuntary petition (the "Involuntary Petition") under chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York.

3. I make this Declaration in support of Xinyuan's motion (the "Extension Motion") for entry of an Order extending the time to file an answer or respond to the Involuntary Petition for an additional 30 days. In this Declaration, I shall also respond to certain matters raised in the

Declaration of Paul Matthew Smith ("Mr. Smith") filed in support of the Petitioning Creditors' objection to the Extension Motion (the "Smith Declaration").

4. Save where otherwise indicated, the facts and matters deposed to in this Declaration are within my own knowledge and belief, and I believe them to be true. Insofar as any facts and matters are not within my personal knowledge, I believe them to be true to the best of my information and belief based on information provided by Xinyuan and/or its professional advisers, my inquiries and documents in my possession.

5. Where this Declaration comprises matters that are statements of legal opinion, such statements are based on my knowledge of the laws of the Cayman Islands as applied by the Grand Court of the Cayman Islands as at the date of this Declaration, and such statements represent my views of Cayman Islands law as a practising lawyer admitted and licensed to practise law in the Cayman Islands.

6. In this Declaration, I have made reference where necessary to communications between Harneys and Xinyuan. In doing so, I do not waive privilege in those communications.

### I.    Personal background and qualifications

7. I was admitted to practise as an Attorney-at-Law of the Grand Court of the Cayman Islands (the "Cayman Court") in 2012.

8. I graduated with first class honours in Law from the University of Hull in 2005 and obtained a distinction from the University of Law, York in 2006.

9. I undertook my training contract in England with Andrew Jackson solicitors, qualifying as a solicitor in England and Wales in 2008.

{12473501:1}    2

10.     I practised with Andrew Jackson until 2012 at which time I joined the Cayman Islands office of Conyers Dill & Pearman (Conyers). I was elected to the partnership at Conyers in 2017.

11.     I joined the Cayman Islands office of Forbes Hare in January 2022 before joining Harneys in September 2023.

12.     A copy of my detailed curriculum vitae is attached hereto as **Exhibit 1**.

13.     Harneys is an international law firm that practises the law of the Cayman Islands and various other jurisdictions. I practise the law of the Cayman Islands exclusively. Harneys' practice covers complex commercial and insolvency litigation with a focus on international and cross border disputes. Harneys is one of the leading litigation firms in the Cayman Islands and its litigation team currently comprises 5 partners and over 13 other lawyers.

## II.    Overview of Xinyuan's Restructuring

14.     As stated in the Extension Motion, Xinyuan is pursuing a debt restructuring through a scheme of arrangement pursuant to section 86 of the Cayman Islands Companies Act (2025 Revision) (the "Restructuring"). The Restructuring is to be implemented by way of a scheme of arrangement in the Cayman Islands (the "Scheme") which aims to fully compromise and discharge the Company's liabilities and indebtedness under four series of New York law-governed senior notes (as defined in the Extension Motion as the "Scheme Notes"). In return, the holders of the Scheme Notes (the "Scheme Creditors") will be able to elect from and receive a combination of new senior notes, perpetual securities and shares issued by the Company (collectively, the "Scheme Consideration").

15. On 25 June 2025, after the Extension Motion was filed, Xinyuan filed the following documents (together, the "Petition Documents") with the Cayman Court, copies of which are attached hereto as **Exhibit 2**, seeking the sanction of the Scheme:

(a) a summons (the "Summons") seeking orders and directions in respect of the Scheme, including an order that the Company be at liberty to convene a single meeting of the Scheme Creditors for the purposes of voting on the Scheme (the "Scheme Meeting");

(b) the first affirmation of Yong Zhang, the Chairman of Xinyuan's board of directors, filed on behalf of the Company; and

(c) the Petition seeking an order from the Cayman Court sanctioning the Scheme.

16. As part of Xinyuan's wider restructuring plan, Xinyuan intends to incorporate a new entity within its corporate group to issue the new senior notes under the proposed Scheme. Xinyuan also intends to effect a spin-off of certain parts of its business to the newly incorporated company, in order to deleverage and reduce its debt burden (the "Corporate Spin-off").

### III.  Engagement of Harneys

17. Harneys was engaged by Xinyuan to act as its Cayman Islands legal adviser in connection with the Scheme on 15 May 2025.

18. Harneys' engagement is limited to advising Xinyuan as to matters of Cayman Islands law and representing Xinyuan in its application to the Cayman Court to promulgate the Scheme to the Scheme Creditors.

19. Accordingly, I shall restrict my comments in this Declaration to matters concerning the Restructuring and the Scheme to the extent that they relate to Cayman Islands law and the proceedings that have been filed by Xinyuan in the Cayman Islands. I shall not, in this Declaration,

address any matters raised by Mr. Smith in the Smith Declaration to the extent that they fall outside the scope of Harneys' engagement and/or are in respect of commercial negotiations between Xinyuan and its creditors (which I understand have been handled by Xinyuan).

### IV.    Steps taken to progress the Restructuring

20.    Xinyuan informs me that, at the time that Harneys was engaged, the Company had already been in longstanding discussions with its relevant stakeholders regarding the appropriate structure and terms of the Restructuring. Harneys was not privy to the commercial negotiations regarding the Restructuring and the process was largely spearheaded by the Company.

21.    In paragraphs 22 to 39 below, I shall summarise my understanding of the steps taken by Xinyuan to progress the Restructuring both before and since Harneys' engagement.

*Engagement of other professional advisers*

22.    I understand that, in addition to Harneys, Xinyuan has engaged the services of several other professional advisers who have been assisting the Company to formulate the Restructuring and to promulgate the Scheme.

23.    In particular, Xinyuan has engaged the law firm Zhong Lun Law Firm LLP ("Zhong Lun") to act as its international legal counsel. Zhong Lun is leading and coordinating the cross-border elements of the Restructuring. Harneys has therefore been preparing the Scheme in conjunction with Zhong Lun. Xinyuan informs me that Zhong Lun was engaged in around 15 April 2025.

24.    In addition to Harneys and Zhong Lun, Xinyuan has appointed (i) DF King Ltd, as the information agent to facilitate communications between Xinyuan and the Scheme Creditors in connection with the Restructuring; and (ii) Deloitte & Touche Financial Advisory Services Ltd ("Deloitte") to provide a report on the estimated total recovery for Scheme Creditors in the event

{12473501;1}    5

of a group-wide liquidation of scenario, as compared to the anticipated recoveries to Scheme Creditors under the Cayman Scheme (the "Liquidation Analysis"). Xinyuan informs me that DF King Ltd was engaged on around 16 May 2025 and that Deloitte was engaged on around 16 June 2025.

*Entry into a restructuring support agreement*

25.   At the time that Harneys was engaged, Xinyuan had already been in advanced discussions with a group of holders of the Scheme Notes (the "Initial Consenting Creditors") with a view to facilitating the formulation of a holistic restructuring proposal. Xinyuan informs me that these discussions had been ongoing since about November 2024.

26.   As a result of these discussions, Xinyuan entered into a restructuring support agreement[1] (the "RSA") with the Initial Consenting Creditors on 26 May 2025. The RSA forms the basis for the implementation of the Restructuring and appends a term sheet setting out the terms of the proposed Restructuring. Under the terms of the RSA, Scheme Creditors who have executed or acceded to the RSA, are required, subject to certain rights for such Scheme Creditors to terminate their participation in the RSA, not to take any Enforcement Actions (as defined in the RSA) against the Company, and to take all commercially reasonable endeavours to support the proposed Restructuring and vote in favour of the Scheme.

27.   As stated in paragraph 13 of the Extension Motion, at the time that the Extension Motion was filed, holders of approximately 25% of the aggregate principal amount of the Scheme Notes had already acceded to the RSA.

28.   Since then, Xinyuan has made further progress in garnering support for the RSA. As at 17 June 2025, I am informed that approximately 38 Scheme Creditors holding over 31.48%

---

[1] See **Exhibit 3**.

{12473501:1}   6

of the total aggregate principal amount of the Scheme Notes have signed the RSA. I am also informed that Xinyuan expects to obtain support from Scheme Creditors holding an additional 30% of the total aggregate principal amount of the Scheme Notes, and is in the process of working towards eventually reaching the requisite statutory majority required for the approval of the Scheme.

*Summary of Scheme Procedure Following Filing of the Petition*

29. As I state in paragraph 15 above, the Petition Documents were filed with the Cayman Court on 25 June 2025. Upon filing the Petition Documents, Xinyuan asked the Cayman Court to list the hearing of the Summons (which Mr. Smith described as the "*preliminary hearing*" in paragraph 14 of the Smith Declaration; it is more commonly known as the "Convening Hearing") in the week of 28 July 2025. The Cayman Court was unavailable on those dates, and it has instead listed the Convening Hearing on 30 September 2025.

30. At least twenty-one days before the scheduled hearing date, the Company will issue a statement to the Scheme Creditors of its intention to promote the Scheme. The statement will also contain details of the Convening Hearing and the proposed classification of the Scheme Creditors. After the Summons is heard, and assuming that the Cayman Court grants the orders sought in the Summons, the Company intends to convene the Scheme Meeting on or around 27 October 2025.

31. Prior to the Scheme Meeting, Xinyuan will give notice of the Scheme Meeting to the Scheme Creditors and its relevant stakeholders, and provide the Scheme Creditors with the relevant scheme documents to allow them to consider the terms of the proposed Restructuring as contemplated under the Scheme.

32. The Scheme must then be approved by the requisite statutory majority referred to in paragraph 19 of the Smith Declaration, namely, a majority in number representing 75% in value of the creditors or class of creditors present and voting at the Scheme Meeting, before the Company can return to the Cayman Court to seek sanction of the Scheme at a subsequent hearing.

33. Once the Scheme is sanctioned by the Cayman Court, a copy of the sanction order has to be delivered to the Registrar of Companies in the Cayman Islands prior to the Scheme becoming effective.

34. The Company has prepared an indicative timetable for the implementation of the Restructuring taking into account various factors including the lead time required by the Company's advisers to prepare the necessary documents in connection with the Restructuring and the court proceedings (in which respect, see paragraphs 36 to 39 below), which is annexed hereto as "**Exhibit 4**".

35. Should the Restructuring proceed according to plan, it is anticipated that the Restructuring of the Company will be completed by December 2025 (notwithstanding that the longstop date of the Restructuring as provided for in the RSA, and by which time all necessary steps to complete the Restructuring must be completed, is currently 30 April 2026).

*Preparation of scheme documents*

36. After the Petition Documents have been filed, there will be several further documents that need to be prepared by Xinyuan in advance of the Convening Hearing referred to in paragraph 29 above.

37. As at the date of this Declaration, Xinyuan has been working closely with its professional advisers (including Harneys), to prepare the Scheme and its ancillary documents, as well as the relevant documents for the implementation of the Restructuring.

38. These documents include (i) an explanatory statement which sets out an overview of the terms of the Scheme and an explanation of the mechanics of the Scheme, (ii) the Scheme document, (iii) a solicitation packet which will provide details of the date and time of the Scheme Meeting, the process of voting on the Scheme and the relevant voting forms, and (iv) drafts of the new debt instruments to be issued as Scheme Consideration once the Restructuring is effective.

39. The parties have made significant progress in the preparation of these documents and are working towards finalising the documents by early September 2025, ahead of the Convening Hearing.

### V. Specific responses to the Smith Declaration

40. In paragraphs 22 to 39 above, I have outlined the steps that Xinyuan has taken so far to progress the Restructuring. In doing so, I have intended to clarify any misunderstandings in the Smith Declaration concerning the status of the Restructuring, including in particular, any suggestion that Xinyuan has not already made significant progress to advance the Restructuring.

41. In this section, I shall respond to certain specific assertions made in the Smith Declaration relating to the proposed Scheme. These assertions are set out in paragraph 33 of the Smith Declaration. I will not, in this Declaration, repeat the relevant Cayman Islands statutory framework applicable to schemes of arrangement, which are adequately summarised at paragraphs 9 to 30 of the Smith Declaration. I confirm that this summary is accurate and that it faithfully reproduces the relevant statutory procedure applied by the Cayman Court as at the date of this Declaration. For completeness, Xinyuan does not currently intend to appoint a restructuring officer. Therefore, I shall not address any matters raised in the Smith Declaration relating to the appointment of a restructuring officer in this Declaration.

*Class composition*

42. At paragraph 33(a) of the Smith Declaration, Mr. Smith makes a number of observations regarding the way the Scheme Creditors could potentially be classed for the purposes of voting on the Scheme. Specifically, he states that:

(a) *"The assertions made by [Xinyuan] at paragraphs 10 to 13 of the Motion proceed on the assumptions (i) that all holders of the "Scheme Notes" can properly be treated as a single class of creditors, and (ii) that this is the only class of creditors whose support would be required for a scheme of arrangement"*; and

(b) *"It is also unclear whether each of these separate series of notes can properly be said to constitute a single class of creditors"*.

43. With regard to the applicable legal principles relating to the classification of creditors in a scheme of arrangement, Mr. Smith correctly points out at paragraph 15 of the Smith Declaration that the relevant test for the composition of creditor classes applied by the Cayman Court is found in paragraph 3.2 of Practice Direction No. 2 of 2010 issued pursuant to Order 1, rule 12 of the Cayman Islands Grand Court Rules, 1995 (as revised), which states:

*"3.2 In every case the Court will consider whether it is appropriate to convene class meetings and, if so, the composition of the classes so as to ensure that each meeting consists of shareholders or creditors whose rights against the company which are to be released or varied under the scheme, or the new rights which the scheme gives in their place, are not so dissimilar as to make it impossible for them to consult together with a view to their common interest."*

44. It is well-established that as a matter of Cayman Islands law the starting point in determining classification is to identify an "appropriate comparator", which is the alternative

{12473501:1}  10

outcome if the scheme does not proceed. Having done so, the court will analyse (a) the existing legal rights of scheme creditors against the company which are to be released or varied under the scheme (having regard to the appropriate comparator) (the "Rights In") and (b) the new rights which the scheme gives to the scheme creditors by way of compromise or arrangement (the "Rights Out").

45. If, having carried out that exercise, there is a material difference between the "Rights In" and "Rights Out" of those scheme creditors such that the scheme creditors are so dissimilar as to make it impossible for them to consult together with a view to their common interest, the scheme creditors must be divided into separate classes and separate scheme meetings must be held for each class.

46. Xinyuan will seek an order that there is a single class of Scheme Creditors comprising all Scheme Creditors under the Scheme Notes (i.e., the January 2024 Senior Secured Notes, the 14.5% senior notes due 2023, the 14.2% senior notes due 2023 and the 3.0% senior notes due 2027).

47. To this end, Xinyuan has concluded (and has explained in the Petition Documents) that it is appropriate for all Scheme Creditors to vote in a single class, on the basis that their "Rights In" and "Rights Out" against the company are sufficiently similar to one another, such that no further class divisions are necessary. Xinyuan has reached this conclusion on the grounds that:

(a) In terms of the "Rights In" of the Scheme Creditors, all Scheme Creditors have materially the same rights against the Company which are to be released or varied under the Scheme, given that:

(i) They all benefit from the same security and guarantee package regardless of which series of Scheme Notes they hold. Each of the four series of Scheme

        Notes are guaranteed by six of Xinyuan's direct and/or indirect subsidiaries (together, the "Subsidiary Guarantors") and are secured by a share pledge granted by Xinyuan and Xinyuan Real Estate, Ltd over the capital stock of each of the Subsidiary Guarantors (save for Xinyuan International (HK) Property Investment Co., Limited); and

  (ii)    In the event that the Scheme fails, it is likely that Xinyuan and/or other members of its corporate group will enter into an insolvent liquidation. In those circumstances, the claims of all Scheme Creditors will become immediately due and payable, and the rights of all Scheme Creditors against the Company would rank *pari passu* as between themselves.

(b)    As to "Rights Out" against the Company, all Scheme Creditors have the right to receive the same entitlements under the Scheme if the Scheme becomes effective, and the existing rights of each Scheme Creditor against the Company under the Existing Notes will be compromised in materially the same way as between themselves.

48.    I note that Mr. Smith has also indicated at paragraph 33(a) of the Smith Declaration that "*there is scope for creditors to argue that there is a divergence of interests between the holders of the various series of notes, particularly in circumstances where the holders of some $86.7 million of the January 2024 Senior Secured Notes accepted the exchange offer referred to in paragraphs 8 and 10 of the Motion.*"

49.    However, I further note that Mr. Smith simply says that "*there is scope*" to argue that various holders' interests diverge. He does not positively assert that the holders' interests *do* diverge, nor to the extent that there is any divergence, that it would be inappropriate to convene a

single-class Scheme Meeting. In the event that Mr. Smith or the Petitioning Creditors do assert this position in future, I reserve the Company's right to respond to such an assertion.

50. In the event that the Petitioning Creditors do assert that the holders of the Scheme Notes do not fall into a single class, the Cayman Court will consider and resolve this issue at the Convening Hearing referred to in paragraph 29 above.

*The classification of the Petitioning Creditors*

51. At paragraph 33(b) of the Smith Declaration, Mr. Smith claims that "*if the Cayman court were to conclude that the various series of notes should be treated as separate classes, then the Petitioning Creditors would represent significantly more than 10% of the class comprising the January 2024 Senior Secured Notes*".

52. I have set out Xinyuan's justifications for proposing a single class of Scheme Creditors for the purposes of voting on the Scheme at the Scheme Meeting in paragraph 47 above. For the reasons set out above, Xinyuan has concluded that no further class divisions are necessary.

53. As Xinyuan mentioned at paragraph 11 of the Extension Motion, the Petitioning Creditors appear to hold approximately 10% of the aggregate outstanding principal amount of the Scheme Notes based on their contention that they hold $65,800,000 of the debt due under the January 2024 Senior Secured Notes. On the basis of the foregoing, if all Scheme Creditors vote in a single class, the Scheme could nevertheless meet the threshold for approval by the statutory majority even if the Petitioning Creditors vote against the Scheme. In this scenario, the support of the Petitioning Creditors will not have any bearing on the overall success of the Scheme.

*The classification of alleged affiliated creditors*

54. At paragraph 33(d) of the Smith Declaration, Mr. Smith refers to "*the possibility that [Xinyuan] may have manufactured creditor support for the RSA and that [Xinyuan] and/or*

{12473501:1}  13

*its controlling shareholder or affiliates owns or controls the undisclosed creditors that allegedly support the RSA*", and that "*it could certainly be argued that creditors controlled by [Xinyuan] should be treated as a different class from arm's length creditors.*"

55. I note that the Smith Declaration does not positively allege that Xinyuan has in fact manufactured creditor support, nor that Xinyuan (or its controlling shareholder or affiliates) owns or controls any supporting creditor(s) ("Affiliated Creditors"). The Smith Declaration simply refers to the existence of Affiliated Creditors as a "*possibility*". I am informed that Xinyuan contends that there is no factual evidence to support any allegation asserting the existence of Affiliated Creditors.

56. In any event, the Petitioning Creditors will (if they see fit) have the opportunity to raise these allegations (along with any other objections they may have to the Scheme Creditors voting in a single class) in factual evidence and legal submissions at the Convening Hearing. The Cayman Court will then give judgment on the matters raised at the Convening Hearing, in which it will decide : (i) whether there is any factual merit to the allegations; and (ii) if the allegations are accurate, whether the rights of the alleged Affiliated Creditors are so dissimilar from the other Scheme Creditors as to make it impossible for them to consult together in a single class. If the Cayman Court decides that the existence of Affiliated Creditors does make it impossible for them to consult in a single class with other Scheme Creditors, then it will direct that the Affiliated Creditors vote in a separate class from the rest of the Scheme Creditors.

57. Therefore, as the Smith Declaration notes at paragraph 33(d), if the Petitioning Creditors do assert the existence of alleged Affiliated Creditors, this would "*ultimately be a matter for the Cayman court to determine based on the evidence presented by [Xinyuan] and [the Petitioning Creditors]*".

*Clarification on the headcount test*

58. At paragraph 33(e) of the Smith Declaration, Mr. Smith states that *"the Motion addresses the value threshold but is silent as to the requirement for a numerical majority"* and *"on the information currently available it is not possible to say whether [Xinyuan] would be able to satisfy both limbs of the test."*

59. In this respect, the relevant test for approval of the Scheme is found in section 86(2) of the Cayman Islands Companies Act (2025 Revision). Section 86(2) has also been referred to in paragraph 19 of the Smith Declaration, and it provides that:

*"(2) If a majority in number representing seventy-five per cent in value of the creditors or class of creditors, as the case may be, <u>present and voting either in person or by proxy at the meeting</u>, agree to any compromise or arrangement, the compromise or arrangement shall, if sanctioned by the Court, be binding on all the creditors or the class of creditors, as the case may be, and also on the company or, where a company is in the course of being wound up, on the liquidator and contributories of the company." (emphasis added)*

60. It is clear from section 86(2) that the threshold for approval of the Scheme is assessed by Scheme Creditors who are <u>present and voting</u> at the Scheme Meeting. Therefore, the precise headcount or the *"numerical majority"* referred to in the Smith Declaration will only be known at or after the Scheme Meeting, depending on attendances. Given that 38 Scheme Creditors – excluding the Petitioning Creditors – have already indicated their support for the Restructuring (see paragraph 28 above), I consider it unlikely on the basis of the information presently available to me that the Company will have any difficulty in obtaining a numerical majority of supportive Scheme Creditors at the Scheme Meeting.

61. For present purposes, Xinyuan has only referred to the value of the debts that certain Scheme Creditors hold (such as in paragraphs 10 to 13 of the Motion) to provide an indication of the level of support it has received so far for the Scheme. The reference to the value of the debts held by Scheme Creditors who have indicated their support for the Scheme is meant to enable the Cayman Court and other interested parties to gauge the proportion of debt held by these Scheme Creditors against the total amount of the Company's debts to be compromised under the Scheme. It is not meant to be determinative, as the outcome of the Scheme will depend on the actual votes cast at the Scheme Meeting.

### VI. Conclusion

62. In this Declaration, I have sought to address Mr. Smith's concerns regarding the viability of the proposed Scheme. As I mentioned above, Xinyuan, together with Harneys and its other professional advisers, are currently working towards finalising the scheme documents which will be made available to the Scheme Creditors, including the Petitioning Creditors, in due course.

63. Further details of the Scheme and the terms of the proposed Restructuring will be more clearly set out in the scheme documents, as well as the documents filed with the Cayman Court.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 8, 2025

BEN HOBDEN