**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

In re:                                               Chapter 11

     Xinyuan Real Estate Company Ltd.,            Case No. 25-10745 (PB)

            Debtor.                        **FOR PUBLICATION**

-------------------------------------------------------------x


**DECISION DENYING DEBTOR'S MOTION TO DISMISS INVOLUNTARY PETITION**


**APPEARANCES:**

WINDELS MARX LANE & MITTENDORF, LLP
*Counsel for the Debtor*
156 W. 56th Street
New York, New York 10019
By: Gabriel Altman
    Eloy A. Peral

WOLLMUTH MAHER & DEUTSCH LLP
*Counsel for the Petitioning Creditors*
500 Fifth Avenue
New York, NY 10110
By: Paul R. DeFilippo
    Nicholas Servider
    Ryan Kane
    James N. Lawlor

UNITED STATES DEPARTMENT OF JUSTICE
*Counsel for the Office of the United States Trustee*
One Bowling Green
New York, NY 10104
By: Tara Tiantian


**Hon. Philip Bentley**
**U.S. Bankruptcy Judge**

## Introduction

Xinyuan Real Estate Company Limited (the "Debtor") is the parent company of a corporate group (the "Group" or "Xinyuan") that operates a large property development company in the People's Republic of China. The Debtor is incorporated in the Cayman Islands, but its management lives and works in China, where the bulk of the Group's operations and assets are located. Since the downturn in China's real estate market that began in late 2020, Xinyuan has been struggling to pay its billions of dollars of funded debt. In 2022 and 2023, Xinyuan restructured some of that debt, but that restructuring proved insufficient. In January 2025, unable to pay $170 million of senior notes that came due that month, the Debtor commenced restructuring negotiations with the holders of those notes.

In April 2025, three investment funds holding about $65 million of the Debtor's senior notes filed an involuntary chapter 11 petition in this Court. The following month, shortly before its deadline to respond to that petition, the Debtor announced its plan to restructure in the Cayman Islands. In June 2025, the Debtor filed a judicial proceeding in the Cayman Islands to restructure about $600 million of U.S.-dollar denominated debt, including the senior notes held by the petitioning creditors, through a scheme of arrangement (the "Scheme"). The Debtor has now moved to dismiss the involuntary petition on a number of grounds, principally abstention under Bankruptcy Code § 305(a). The Debtor also seeks dismissal for cause under Code § 1112(b) or, alternatively, on *forum non conveniens* grounds.

Abstention by a bankruptcy court in favor of a competing foreign insolvency proceeding is often warranted to avoid the disruption and additional expense that dueling proceedings can cause. If the Debtor were making progress in its Cayman Islands proceeding and could show a reasonable likelihood of successfully reorganizing there, the Court would be inclined to dismiss the involuntary petition on abstention grounds. However, over the past half year, there has been no activity in the Cayman case, nor does the Debtor appear to have made any progress behind the scenes. Despite repeated representations

that it would soon obtain additional creditor support, the Debtor still only has the support of creditors holding 31% of the Scheme debt—the same level of support it had last July. The Debtor's restructuring appears to have reached an impasse.

Moreover, even if the Debtor were somehow able to obtain the 75% level of creditor support that Cayman Islands law requires for approval of the Scheme, its Cayman restructuring would still face additional hurdles. The Cayman court would need to approve the Debtor's decision to put all Scheme creditors in a single class, despite the varying interest rates (ranging from 3% to 14.5%) and varying maturities of the four tranches of Scheme debt. In addition, the Debtor would need to obtain a U.S. bankruptcy court's recognition of its Cayman restructuring as a foreign proceeding—an essential step, since all Scheme debt is U.S.-dollar denominated and subject to New York choice of law and forum selection clauses. This could prove challenging, given the Debtor's lack of any business operations in the Cayman Islands, plus the fact that the Group's business and the Debtor's restructuring are being managed from Beijing. Existing precedent in this District would support a finding that the Debtor's center of main interests is in the Cayman Islands if, but only if, the Debtor first obtained overwhelming creditor support *and* no objections to recognition were filed.

In these circumstances, the Debtor has not met its burden of demonstrating that abstention would be in the best interests of its creditors. To the contrary, it appears that creditor interests would be better served by allowing this involuntary case to proceed. Most important, chapter 11 gives the Court the power to ensure that the restructuring will not continue to stall. If the Debtor fails to make progress within a reasonable time, its exclusive right to file a chapter 11 plan may lapse or be terminated, giving creditors the ability to file and confirm a plan of their own—something they cannot do in the Cayman Islands without the Debtor's support. Moreover, the mere possibility of an eventual creditor plan in this case could potentially break the impasse in the Cayman case, in which event the Court might be receptive to a motion to suspend further proceedings in this case on abstention grounds.

At present, however, the Debtor has not shown that abstention would benefit creditors. Even more clearly, the Debtor has not shown cause to dismiss under Bankruptcy Code § 1112(b) or on *forum non conveniens* grounds. The Court therefore will deny the Debtor's motion to dismiss in its entirety.

**FACTUAL & PROCEDURAL BACKGROUND**[1]

### A. The Debtor and the Xinyuan Group

The Debtor is a Cayman Islands exempted company, which was formed in 2007. It is a pure holding company, with no material operations of its own. It serves as the ultimate corporate parent of a group of direct and indirect subsidiaries engaged in the business of real estate development and property management, which operate primarily in the People's Republic of China (the "PRC" or "China"). For its operations in the PRC and the U.S., the Group operates through local holding companies, which own the operating entities; the Group has established a separate subsidiary for each of its development projects.[2] The Debtor's shares are listed on the New York Stock Exchange ("NYSE").

The Debtor's revenues, which derive principally from the sale of residential units in its properties, have declined in recent years—from $950 million in 2022 to $805 million in 2023 and $515 million in 2024—due to a decline in the sales of its units in China and elsewhere. Although the Debtor had a net income of $30 million in 2023, it suffered net losses of $259 million and $46 million in 2022 and 2024, respectively. *See* Xinyuan Real Estate Co., Ltd, Annual Report (Form 20-F), at 55 (April 29, 2025).

The Group's assets are primarily real-estate related, consisting of properties completed and under development and properties held for lease, as well as some property, plant and equipment and long-term

---

[1] The facts summarized below, which for the most part are undisputed, are taken from the parties' declarations and other filings in connection with the motion to dismiss or otherwise in this bankruptcy. No testimony was offered in connection with the motion to dismiss; instead, the parties rested on their papers.

[2] As of December 31, 2024, Xinyuan had 115 direct and indirect subsidiaries. Of those subsidiaries, 95 were located in China, 11 in the U.S., 3 in the Cayman Islands, 3 in Hong Kong, 2 in Malaysia, and 1 in the BVI. *See* Xinyuan Real Estate Co., Ltd, Annual Report (Form 20-F), at Exhibit 8-1 (April 29, 2025).

investments. As of December 31, 2024, the Group reported total assets of approximately US$5.02 billion and liabilities of US$4.9 billion; the Debtor reported total assets of approximately US$1.03 billion and liabilities of US$1.13 billion.

## B. The Location of the Debtor's and the Group's Management

The operations of the Debtor and the Xinyuan Group are directed and overseen principally from the Group's headquarters in Beijing. The chairman, chief executive officer and chief financial officer of the Debtor, as well as all other the members of the Debtor's board, live and work in mainland China. *See* Xinyuan Real Estate Co., Ltd, Annual Report (Form 20-F), at Exhibit 135 (April 29, 2025). At the January 13, 2025 hearing, Debtor's counsel stated that he was not aware of any members of the Debtor's senior management who live or work outside of the PRC.

Although the Debtor is incorporated in the Cayman Islands, it appears to have only a "mail drop" presence there. The Debtor does not have any employees in the Cayman Islands, nor any actual physical office, but just a registered office located at the offices of Maples Corporate Services Limited in George Town, Grand Cayman. Moreover, the Debtor is registered in the Cayman Islands as an exempted company, which means it cannot conduct business in the Cayman Islands except to the extent needed to support its international operations.[3] At the hearing on its motion to dismiss, the Debtor's counsel admitted that he was not aware of the Debtor having any meaningful business operations or assets in the Cayman Islands, except to the extent the stock the Debtor holds in its Cayman-incorporated subsidiaries

---

[3] A company may register as an "exempted company" if its business is "carried out mainly outside the [Cayman] Islands." Companies Act (2025 Revision) § 163 (Cayman Is.). An exempted company "shall not carry on a trade or business in the [Cayman] Islands with any person, except in furtherance of the business of the exempted company carried on outside of the [Cayman] Islands," but nothing prevents the exempted company from "effecting and concluding contracts in the [Cayman] Islands and exercising in the [Cayman] Islands all its powers necessary for the carrying on of its business outside the [Cayman] Islands." *Id.* § 174(1) and (2).

could be deemed located there. Debtor's counsel also admitted that the key decisions concerning the restructuring have been made in the PRC.

The Debtor's principal connection to the Cayman Islands, other than being incorporated there, is that it filed its restructuring petition there. As a result of that forum choice, some of the professionals working on the restructuring, though perhaps not a majority, are based in the Cayman Islands. Each of the principal firms engaged by the Debtor to assist with the Scheme—its law firm, financial advisor and information agent—is an international firm with a Cayman Islands presence. It is unclear from the record how much of the work performed by these firms has been done in the Cayman Islands.

The presence of the Debtor and the Xinyuan Group in the United States is more substantial. All of the Scheme debt is U.S. dollar-denominated debt, governed by New York choice of law and forum selection clauses. In addition, although the Debtor itself does not have any direct operations or employees in the United States, the Xinyuan Group has significant U.S. operations through the 11 direct or indirect subsidiaries of the Debtor that are incorporated in the U.S. Through those subsidiaries, the Xinyuan Group operates three projects in the U.S., all in New York City; it leases an office in New York City and employs a small number of U.S. professionals to oversee project development.[4] The Debtor itself does not employ any of these individuals, nor does it directly own any material tangible assets in the U.S. Its principal U.S. assets are intangibles—namely, the stock of its U.S. subsidiaries and the intercompany debt owed by some of its U.S. subsidiaries.[5]

---

[4] Two of the Group's U.S. projects (one in Manhattan, the other in Brooklyn's Williamsburg neighborhood) are completed; the third (in Flushing, Queens) is in the early stages. *See* Xinyuan Real Estate Co., Ltd, Annual Report (Form 20-F) (April 29, 2025), at 24; *see also id.* at 74 (U.S. employees); *id.* at 96 (New York City office); *id.* at 56-57, 73-74 (listing all of Xinyuan Group's projects outside of China).

The Group previously operated a fourth U.S. project through two of the Debtor's U.S. subsidiaries, but those subsidiaries filed chapter 11 petitions in 2024 and, in that reorganization, transferred ownership of their assets to creditors.. *See In re Hudson 888 Owner LLC*, Case No. 24-10021-mew (Bankr. S.D.N.Y. Dec. 5, 2024); *In re Hudson 888 Holdco LLC*, Case No. 24-10022-mew (Bankr. S.D.N.Y. Dec. 5, 2024).

[5] The Debtor does not claim that it lacks sufficient assets in the U.S. to satisfy the requirement of Bankruptcy Code § 109(a) that a debtor have at least some property in the U.S. *See* 11 U.S.C. § 109(a); *see also In re B.C.I. Finances Pty Ltd.*, 671 B.R. 669 (Bankr. S.D.N.Y. 2025) (construing § 109(a)'s requirement that a debtor have "property in the United States").

## C.  Events Leading to the Debtor's Restructuring

For the past five years, Xinyuan has been struggling to pay its debts. In 2020, the Group commenced efforts to refinance its maturing offshore notes, but those efforts were impeded by a contraction in the offshore debt capital markets and tightening conditions in the PRC real estate sector. Regulatory measures, including the PRC's new "Three Red Lines" policy, constrained borrowing capacity, while declining property sales and reduced buyer confidence adversely affected cash flow and liquidity. These developments materially weakened the Group's financial position, eventually leading to a series of non-payment defaults on its offshore notes between 2022 and 2025.

In 2022 and 2023, the Group restructured a total of US$880 million of onshore and offshore debt. Those restructurings included the rollover of certain onshore corporate bonds and an exchange offer for more than $300 million of the Debtor's senior notes. *See* Xinyuan Real Estate Co., Ltd, Annual Report (Form 20-F), at 14, 128 (April 29, 2025). However, the Group was not able to reach agreements concerning more than $2 billion of other funded debt, including the debt that it now seeks to restructure— namely, the $731 million, consisting of $601 million in principal plus $130 million of interest, that the Debtor owes to holders of U.S. dollar-denominated senior notes (the "Existing Notes"). All of the Existing Notes are in default.

The Group has not restructured, and does not now seek to restructure, its other funded debt. That other debt consists of (i) US$71 million owed by the Debtor to holders of RMB-denominated senior notes; (ii) US$299 million in other financial indebtedness of the Debtor; and (iii) about US$1.16 billion of financial indebtedness of the Debtor's subsidiaries, including onshore bank loans and onshore bonds.

## D.  The Involuntary Chapter 11 Petition and the Debtor's Cayman Scheme of Arrangement

In January 2025, the Debtor was unable to pay $170 million of Existing Notes that came due that month. The Debtor commenced negotiations with the holders of those notes, including the Petitioning Creditors, over the terms of a potential Cayman Islands scheme of arrangement.

On April 14, 2025, three Hong Kong-based investment funds (the "Petitioning Creditors") filed an involuntary chapter 11 petition (the "Involuntary Petition" or "Petition") against the Debtor. The Petitioning Creditors hold $65.8 million of one tranche of the Existing Notes—namely, the Debtor's 14.0% senior notes due 2024 (the "2024 Notes"). The Petition alleged that (i) each Petitioning Creditor was eligible to file an involuntary petition under Bankruptcy Code § 303(b), (ii) the Debtor was eligible to be a debtor under Code § 303(a), and (iii) the Debtor was not paying its debts as they become due— in particular, it had failed to pay approximately $66 million in principal and interest owed to holders of the 2024 Notes. Each Petitioning Creditor also alleged that its claim against the Debtor under the 2024 Notes was not contingent or the subject of a bona fide dispute.

On May 27, shortly before its deadline to answer the Involuntary Petition, the Debtor announced that it had executed a restructuring support agreement (the "RSA") with creditors holding 25% of the outstanding principal amount of the Existing Notes, under which those creditors agreed to support the Debtor's proposed restructuring of the Existing Notes through a scheme of arrangement in the Cayman Islands—i.e., the Scheme. On June 25, 2025, the Debtor filed a petition in the Cayman Islands seeking approval of the Scheme pursuant to section 86 of the Cayman Islands Companies Act (2025 Revision).

Under Cayman Islands law, a scheme of arrangement is a court-supervised restructuring process that allows a company to compromise or reorganize its liabilities with the approval of its creditors. The process typically begins with the company filing a petition before the Grand Court for a so-called convening order. The court then holds a convening hearing, at which the court reviews the proposed scheme and determines whether its classification of the company's debt is proper. *See, e.g.*, *In the Matter of Kaisa Group Holdings Ltd.* [2025] CIGC (FSD) 9, ¶ 7 (rights of creditors in each class must not be

8

"so dissimilar as to make it impossible for them to consult together with a view to their common interest."). If the court enters the convening order, one or more creditors meetings, at which creditors vote on the scheme, are then convened. Each class of creditors must vote to approve the scheme by a majority in number, holding at least 75% in value, of creditors that vote. *See* Companies Act (2025 Revision) § 86(2) (Cayman Is.). If the requisite approvals are obtained, the Grand Court then fixes a date for the sanction hearing, at which the court considers a number of issues, including the scheme's fairness and its compliance with statutory requirements. Once sanctioned and delivered for registration, the scheme becomes binding on all affected creditors. There is no statutorily imposed minimum or maximum timeframe for a scheme of arrangement. The Debtor's RSA contains a "long-stop" date of April 30, 2026, which the Debtor may extend with the consent of certain consenting Scheme creditors. *See* Restructuring Support Agreement [ECF No. 20-5] at 47.

Under the Scheme, the Debtor seeks to exchange the Existing Notes for a combination of new senior notes, perpetual securities and shares issued by Xinyuan. The Existing Notes consist of four series of senior notes: (1) the 14.5% senior notes due 2023, (2) the 14.2% senior notes due 2023, (3) the 14.0% senior notes due January 2024 (i.e., the 2024 Notes), and (4) the 3.0% senior notes due 2027. All four series of notes are subject to New York choice of law and forum selection provisions, and all are guaranteed by a number of the Debtor's subsidiaries (the "Subsidiary Guarantors"). Despite the varying maturities and interest rates of the four tranches of notes, the Scheme puts all four tranches in a single class and provides the same treatment for all tranches. Creditors are required to release all claims against Xinyuan and the Subsidiary Guarantors in exchange for the Scheme consideration.

There has been no activity in the Cayman Islands case since the Debtor filed the Scheme in late June 2025. The first step in the prosecution of any scheme—a convening hearing—has not yet occurred, nor has a date for such a hearing even been set. *See* Declaration of Paul Matthew Smith [ECF 37] at ¶ 23; Declaration of Nicholas Lee Herrod [ECF 38] at ¶ 11. The reason for this lack of activity appears to

be that, as discussed in the next section, creditor support for the Scheme is still far below the 75% level

required under Cayman Islands law.

### E.  The Multiple Extensions of the Debtor's Time to Respond to the Involuntary Petition

The Debtor has not answered the Involuntary Petition.[6] Instead, on May 30, 2025, the Debtor

moved for an extension of its time to answer or move. After a number of extensions agreed to by the

Petitioning Creditors, the Court on November 20, 2025 heard argument on the Debtor's motion for a

further extension. The Court denied the motion, finding that the Debtor had not shown cause for an

extension under Bankruptcy Rule 9006(b)(1), because it had offered no evidence that it was making any

progress in its Cayman restructuring or that it was likely to make progress if given additional time.

As the Court observed in its November 20 bench ruling, the Debtor had represented almost six

months earlier that it expected to obtain additional creditor support in the near term, but that expected

support had not materialized. Specifically, in its May 30, 2025 papers in support of its extension motion,

the Debtor had stated that, in addition to the creditors holding 25% of the Scheme debt that had already

executed the RSA, it expected that creditors holding an additional 30% of that debt would sign the RSA

"very soon." However, by the time of the November 20 hearing on the extension motion, creditor support

for the Scheme had grown slightly, from 25% to 31.48%. In addition, the Debtor no longer reported that

it expected to obtain the additional 30% support "very soon," but merely that it expected to do so at some

unspecified future time.

### F.  The Motion to Dismiss

On November 26, 2025, the Debtor moved to dismiss the involuntary bankruptcy case, seeking

dismissal on three alternate grounds: for cause pursuant to § 1112(b), on *forum non conveniens* grounds,

---

[6] At the January 13, 2026 hearing on the motion to dismiss, Debtor's counsel stated that the Debtor has not yet decided whether to dispute that the Petition satisfies the requirements for an involuntary petition set forth in Bankruptcy Code § 303.

or on abstention grounds pursuant to § 305(a)(1). The Petitioning Creditors filed an opposition to the motion, and the Debtor filed a reply in support. Two declarations were initially filed in connection with the motion: the declaration of Yong Zhang, chairman of the Debtor's board of directors, in support of the motion, and the declaration of the Petitioning Creditors' counsel in opposition to the motion.

On January 13, 2026, the Court held a hearing on the motion to dismiss, at which the Court heard argument from counsel for the Debtor and the Petitioning Creditors. Neither the Debtor nor the Petitioning Creditors presented live testimony; instead, each side rested on the declarations and exhibits it had filed, along with the prior filings in this case.

At the hearing, the Court questioned counsel extensively about the status and prospects of the Cayman Islands restructuring, including the degree of creditor support for the proposed scheme and the anticipated timeline for completion. Counsel for the Debtor represented that, although the level of creditor support for the Scheme was still only 31.48%, the Debtor was "fairly confident" it would receive the support "at some point soon" of a single creditor holding over 30% of the Scheme Notes. Once again, counsel provided no details, let alone any evidence, to back up this this expectation, nor did counsel say anything about the timeframe within which the Debtor expected to reach the statutorily-required 75% support level.

The Court also questioned counsel about what basis the Debtor had to expect that the Scheme, if sanctioned, could ultimately be recognized and enforced in the United States—a *sine qua non* for the restructuring, because all of the Scheme notes are U.S. dollar-denominated and governed by New York choice of law and forum selection clauses. As discussed further below, counsel's responses gave the Court no confidence that the Scheme would meet the legal requirements for recognition, except in the unlikely event the Debtor ultimately obtained overwhelming creditor support and no creditors objected to recognition.

At the conclusion of the hearing, the Court requested supplemental declarations by Cayman Islands counsel for the Debtor and the Petitioning Creditors on two issues: (i) whether Cayman Islands law permits creditors to file a competing scheme of their own; and (ii) whether, if such a filing is permitted, creditors would face legal or practical impediments to their ability to file and prosecute a scheme of their own. The Court also invited Debtor's counsel to file a supplemental declaration in the event of any material new developments in the Cayman Islands proceeding.

On January 23, Cayman Islands counsel for the Debtor and the Petitioning Creditors each submitted a supplemental declaration addressing the issues raised by the Court. Counsel for both sides agreed that, although Cayman Islands law does not specifically bar the filing of a scheme of arrangement by creditors, Cayman law makes it impossible for creditors to do so without the support of the debtor. As counsel for the Debtor stated, "there is a strong line of authority which states that the Cayman Islands Court will only have discretion to sanction such a scheme of arrangement if it has the scheme company's support." Declaration of Nicholas Lee Herrod [ECF No. 38] at ¶ 26 (citing *Re Savoy Hotel Ltd* [1981] Ch 351) at 366; *see also id.* at ¶ 32 ("[T]he Cayman Islands court will not sanction a scheme of arrangement proposed by a creditor unless that scheme is supported by the company."). An independent obstacle, both counsel agreed, is that without the debtor's cooperation, creditors are unlikely to be able to obtain the information about the company's current finances and operations that they need to prepare and prosecute a scheme. *Id.* at ¶¶ 28-29; *see also* Declaration of Paul Matthew Smith [ECF No. 37] at ¶¶ 17-19. As a result of these impediments, counsel acknowledged, creditor-proposed schemes of arrangement are almost unheard of in the Cayman Islands.[7]

---

[7] Cayman Islands counsel for the Petitioning Creditors was aware of no Cayman Islands case in which a creditor filed a scheme of arrangement after the company filed a plan of its own. [ECF No. 37 at ¶ 14] Debtor's counsel was aware of only one such case, and in that case, "the creditor had the full support and cooperation of the company." [ECF No. 38 at ¶ 31 & n.21 (citing *In the Matter of Schahin II Fin. Co. (SPV) Ltd.*)]

The Debtor filed no additional declarations following the January 13 hearing. On January 29, one day before the hearing scheduled for the Court to deliver its bench ruling, two affiliated holders of senior notes—Greatime Limited and Techfull Properties Corp.—filed short declarations in support of the Debtor's motion to dismiss. The two declarations were signed by the same individual, in his capacity as a director of each company, and are identical except for the name, address and holdings of each creditor. Apart from providing undisputed background information and stating that each creditor signed the RSA in late May 2025, the substance of each declaration consists of only two sentences: "The Creditor supports dismissal of the U.S. Involuntary Case. The Creditor fears that forcing Xinyuan into Chapter 11 proceedings may jeopardize the Cayman Restructuring and harm the interests of the Creditor."

At a hearing on January 30, the Court issued a preliminary bench ruling denying the Debtor's motion to dismiss. The Court gave a short summary of its reasons for denying the motion and stated that it would issue a written decision fully setting forth the basis for its ruling. This is that decision.

DISCUSSION

## I.    Dismissal Under Bankruptcy Code § 305(a)(1) is Not Warranted

### A.    Governing Legal Standards

Section 305 of the Bankruptcy Court provides in pertinent part:

> (a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—

> (1) the interests of creditors and the debtor would be better served by such dismissal or suspension . . . .

11 U.S.C. § 305(a)(1).

It is widely recognized that "abstention in a properly filed bankruptcy case is an extraordinary remedy, and that dismissal is appropriate under § 305(a)(1) only in the situation where the court finds that both creditors and the debtor would be better served by a dismissal." *In re Nogin Com. LLC*, 670 B.R. 711, 726 (Bankr. S.D.N.Y. 2025) (internal quotation marks omitted); *accord In re Globo*

*Comunicacoes E Participacoes S.A.*, 317 B.R. 235, 255 (S.D.N.Y. 2004); *In re Genger*, 2023 WL 4311219, at *18 (Bankr. S.D.N.Y. 2023); *In re Schur Mgmt. Co., Ltd.*, 323 B.R. 123, 129 (Bankr. S.D.N.Y. 2005). The movant bears the burden of proof to show that dismissal would benefit both the debtor and its creditors. *See In re Genger*, 2023 WL 4311219, at *18; *accord In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 462-63 (Bankr. S.D.N.Y. 2008).

A court's determination whether to abstain pursuant to section 305(a)(1) is "a fact-intensive inquiry that entails consideration of the totality of the circumstances." *In re Wythe Berry Fee Owner LLC*, 2023 WL 1786407, at *6 (Bankr. S.D.N.Y. 2023). This decision "should be made on a case-by-case basis." *In re TPG Troy, LLC*, 492 B.R. 150, 160 (Bankr. S.D.N.Y. 2013) (internal quotation marks omitted), *aff'd*, 793 F.3d 228 (2d Cir. 2015). Courts in this district have considered seven factors:

> (1) the economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving an equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought.

*In re Monitor Single Lift,* 381 B.R. at 464-65 (Bankr. S.D.N.Y. 2008) (internal quotation marks omitted); *accord In re Genger*, 2023 WL 4311219, at *18; *In re Navient Sols., LLC*, 625 B.R. 801, 819-20 (Bankr. S.D.N.Y. 2021), *aff'd*, 2022 WL 863409 (S.D.N.Y. 2022), *aff'd*, 2023 WL 3487051 (2d Cir. 2023); *In re Newbury Operating LLC*, 2021 WL 1157977, at *10 (Bankr. S.D.N.Y. 2021). The parties agree that these are the governing factors.

Courts apply these factors flexibly, as aids to assist the court's determination of whether dismissal would benefit both the debtor and its creditors. *See In re Globo Comunicacoes*, 317 B.R. at 255 (abstention "requires that both creditors and debtors benefit from the dismissal, rather than applying a simple balancing test to determine whether dismissal is appropriate."). "While all factors are considered,

not all are given equal weight in every case." *In re Monitor Single Lift*, 381 B.R. at 465; *accord In re Navient Sols.*, 625 B.R. at 820. Factors # 1 through 6 are sometimes considered together, to help the court determine whether abstention would facilitate a successful resolution in another forum. *See In re Navient Sols.*, 625 B.R. at 820 (considering factors # 1-6 together "because th[o]se factors touch upon the availability of an alternate forum to efficiently achieve an equitable distribution.").

Factor # 7—the purpose for which the bankruptcy petition was filed—can be entitled to substantial weight, particularly "when the involuntary petition appears to be a debt collection tool in a two-party dispute." *In re Newbury Operating LLC*, 2021 WL 1157977, at *11 (Bankr. S.D.N.Y. 2021) (internal quotation marks omitted). The 1978 Senate Report for section 305 specifically noted the appropriateness of abstention in circumstances of that sort:

> The court may dismiss or suspend under the first paragraph [section 305(a)], for example, if an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the results of creditors in that arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment. The less expensive out-of-court workout may better serve the interests in the case.

S. Rep. No. 95-989, at 36 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5822; *see also In re Navient Sols.*, 625 B.R. at 820 ("'[T]he prototypical fact pattern under section 305(a)(1)' as noted by Congress involves out-of-court workouts and efforts by recalcitrant creditors to commence an involuntary case to gain leverage") (quoting 2 Collier on Bankruptcy ¶ 305.02[2][a] (16th ed. 2021)); *In re Stillwater Asset Backed Offshore Fund Ltd.*, 485 B.R. 498, 509 (Bankr. S.D.N.Y. 2013) ("There is no question that § 305(a)(1) was designed to be utilized where, for example, a few recalcitrant creditors attempted to interfere with an out-of-court restructuring that had the support of a significant percentage of the debtor's creditors.") (internal quotation marks omitted).

When the court is asked to abstain in favor of a foreign proceeding, comity considerations can be entitled to significant weight, depending on the circumstances. For example, in *In re Compania de*

*Alimentos Fargo, S.A.*, 376 B.R. 427 (Bankr. S.D.N.Y. 2007), Judge Bernstein gave substantial weight to comity in dismissing an involuntary chapter 11 petition in favor of an Argentine insolvency proceeding for an Argentine debtor with limited U.S. ties:

> Although abstention under § 305 is considered an extraordinary remedy, . . . the pendency of a foreign proceeding alters the balance by introducing considerations of comity into the mix. The Second Circuit, in this regard, has frequently underscored the importance of judicial deference to foreign bankruptcy proceedings.

*Id.* at 434. As Judge Bernstein noted, deference to the Argentine restructuring was warranted because the debtor was an Argentine company, and all of its business operations, customers and employees were located in that country. In addition, the debtor's insolvency proceeding had been pending in Argentina for years before the U.S. involuntary case was filed. *See id.*

The Debtor contends that this case is governed by the Second Circuit's observation, in *Argo Fund Ltd. v. Bd. of Dirs. of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom Arg., S.A.)*, 528 F.3d 162, 171-72 (2d Cir. 2008) (Sotomayor, J.), that "[c]omity is generally appropriate where the foreign proceedings do not violate the laws or public policy of the United States and if the foreign court abides by fundamental standards of procedural fairness." However, this observation had nothing to do with the standards governing abstention motions under section 305. Instead, the court of appeals was referring to the central role comity can play in decisions under section 304, the since-repealed section of the Bankruptcy Code that addressed recognition of foreign restructurings. That Code section, which Congress replaced with chapter 15 in 2005, expressly directed courts to consider comity when deciding whether to recognize or give assistance to foreign proceedings. *See* 11 U.S.C. § 304(c)(5) (repealed 2005)**.**

The Debtor's reliance on *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418 (2d Cir. 2005), is similarly misplaced. The Debtor cites that decision for the proposition that "U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding . . . so long as the foreign proceedings are procedurally fair and . . . do not

contravene the laws or public policy of the United States." *Id.* at 424. However, the Court here is not being asked to adjudicate creditor claims; instead, it is ruling on a motion to dismiss a chapter 11 bankruptcy pursuant to Bankruptcy Code § 305(a)(1). Neither that Code section nor the case law construing it creates a presumption in favor of abstention. To the contrary, the courts have uniformly held that abstention under section 305(a)(1) is an "extraordinary remedy," appropriate only if the movant shows that abstention would benefit the debtor and its creditors. *In re Genger*, 2023 WL 4311219, at *18.

### B.  The Debtor Has Not Shown That Dismissal on Abstention Grounds is Warranted

The Debtor contends that dismissal of the involuntary chapter 11 case will enhance the prospects for a successful restructuring of its Existing Notes: "The Cayman Proceedings, coupled with Chapter 15 proceedings seeking recognition of the Scheme . . . , will offer a vastly more efficient, economical, and expedited means to resolve the liability under the Scheme Notes." Debtor Br. at 10-11, 15. The Debtor further contends that the Involuntary Petition serves no legitimate rehabilitative purpose, but instead was filed as a litigation tactic to enhance the petitioning creditors' negotiating leverage.

If these claims were true, the Court would grant the Debtor's motion. But the Debtor has provided only minimal support for its sweeping assertions, and the evidence in the record undercuts these allegations more than it supports them. The Debtor therefore has failed to satisfy its burden of showing that dismissal would further the interests of its creditors, or that the Involuntary Petition was filed for an improper purpose. The motion to dismiss the Petition on abstention grounds lacks merit, and the Court will deny it.

### 1.  The Debtor has not shown that dismissal will benefit creditors

If the Debtor's Cayman Islands restructuring case appeared to be headed toward a successful conclusion, the Court would be reluctant to allow a concurrent chapter 11 case to proceed. But as far as can be told from the record, the Debtor's Cayman proceeding appears to be on a path to failure. For that

restructuring to succeed, the Debtor would need to surmount three high hurdles, and the Debtor has failed to show that it is likely to clear any, let alone all, of these barriers.

*First*, under Cayman law, a threshold requirement for approval of the Scheme is that it be approved by creditors holding at least 75% of the Scheme debt. The Debtor has made no showing that it is likely to obtain this level of approval. To the contrary, the Debtor still has only the 31% level of creditor support that it had last July, and it has given the Court no reason to expect it will get additional support any time soon, if ever.[8]

*Second*, even if the Debtor were somehow to obtain the support of 75% of the Scheme creditors, it is still far from clear that it could obtain the Cayman court's approval of the Scheme. The Scheme puts the holders of all four tranches of Scheme notes into a single class and gives them all the same treatment, even though the four tranches have widely varying interest rates (ranging from 3% to 14.5%) and maturity dates (ranging from 2023 to 2027). Under the Bankruptcy Code, a chapter 11 plan of this sort, which gives identical treatment to multiple tranches of debt with materially different terms, would be unconfirmable absent creditor consent. *See* 11 U.S.C. § 1122(a) ("[A] plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.").

Of course, Cayman law may differ from U.S. law on this issue. But the Debtor has made only a brief, and in the Court's view unpersuasive, attempt to show that, under Cayman law, it is proper to put all Scheme debt in a single class. *See* Declaration of Ben Hobden [ECF 20-2] at ¶¶ 47-50. Moreover, in the more than seven months since it commenced its Cayman Islands proceeding, the Debtor has chosen not to schedule a convening hearing. As a result, the Cayman court has not yet had occasion to rule on

---

[8] The two affiliated creditors that filed declarations in support of the motion to dismiss in late January 2026 each stated in its declaration that it had signed the RSA in late May 2025. In other words, these creditors are part of the minority of creditors, collectively holding 31% of the Scheme debt, that have supported the Scheme since last July. Their declarations provide no reason to expect that creditor support for the Scheme is likely to increase above that 31% level.

propriety of the Scheme's classification, and significant uncertainty therefore remains as to whether the Debtor will prevail on that issue.

*Third*, if the Debtor somehow surmounted both of these hurdles, its restructuring would then face a third hurdle, which could prove even more daunting than the first two. The Debtor's counsel has admitted that the Debtor would "likely" need to file a chapter 15 case and obtain a U.S. bankruptcy court's recognition of its Cayman restructuring as a foreign main proceeding.[9] This seems clearly correct, since all of the debt subject to the Scheme is U.S. dollar-denominated and subject to New York forum selection and governing law clauses. Without a U.S. court's recognition of the Cayman restructuring, holders of Existing Notes would be free to sue the Debtor in the U.S. and to seek to collect the full amount of that debt, notwithstanding the Scheme's restructuring of that debt

The issue of whether to recognize the Cayman restructuring as a foreign main proceeding is not now before the Court. Nonetheless, the current record indicates that the Debtor would face significant challenges in obtaining the central ruling required for such recognition—a finding that the Cayman Islands is its "center of main interests," or COMI.

The standards governing determination of a chapter 15 debtor's COMI were set forth by the Second Circuit in *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127 (2d Cir. 2013). The Court of Appeals noted that a debtor's country of incorporation is statutorily presumed to be its COMI, *id.* at 133, 137 (citing Code § 1516(c)), and added that bankruptcy courts have broad discretion to determine a debtor's COMI, *id.* at 138. At the same time, the Second Circuit emphasized that a court's

---

[9] Recognition of the Cayman Islands restructuring as a foreign *non-main* proceeding would almost certainly not be possible, because the Debtor conducts no significant business operations in the Cayman Islands. Bankruptcy Code § 1502(5) defines a "foreign nonmain proceeding" as "a foreign proceeding, other than the foreign main proceeding, pending in a country where the debtor has an establishment"; § 1502(2) in turn defines an "[e]stablishment" as "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2), (5). It is settled that, "[t]o have an establishment in a country, the debtor must conduct business in that country." *In re Creative Fin. Ltd.*, 543 B.R. 498, 520 (Bankr. S.D.N.Y. 2016); *see also In re Modern Land (China) Co., Ltd.*, 641 B.R. 768, 784 (Bankr. S.D.N.Y. 2022) (courts require "proof of more than a mail-drop presence to satisfy the establishment requirement") (internal quotation marks omitted).

COMI determination should be guided by a core principle: "COMI lies where the debtor conducts its regular business, so that the place is ascertainable by third parties." *Id.* at 130; *see also id.* at 136, 138 (reviewing European sources of COMI concept, to which House Report pointed for guidance); *id.* at 138 n.10 (noting importance of "debtor's nerve center, including from where the debtor's activities are directed and controlled") (citation and internal quotation marks omitted).

It is undisputed that the Debtor's "nerve center"—the place from which its management directs the company's operations and makes its key decisions—is in the PRC, not the Cayman Islands. Other than having incorporated in the Cayman Islands and having chosen to restructure there, the Debtor has only minimal Cayman connections. Consequently, a finding that the Debtor's COMI is in the Cayman Islands would be in tension with the notion that "COMI lies where the debtor conducts its regular business," *Fairfield Sentry*, 714 F.3d at 130. Nevertheless, precedent in this District would support a Cayman Islands COMI finding if two conditions were met—specifically, if (i) the Debtor obtained the overwhelming support of its Scheme creditors, and (ii) no party objected to recognition.

If those two conditions were met, the facts of this case would be strikingly similar to those in *In re Modern Land (China) Co., Ltd.*, 641 B.R. 768 (Bankr. S.D.N.Y. 2022), a case decided four years ago by Chief Judge Glenn. In *Modern Land*, as here, the debtor was a PRC-based company that was incorporated in the Cayman Islands and chose to restructure in the Caymans. There, as here, the debtor had only minimal other connections to the Cayman Islands. Judge Glenn nevertheless found the Cayman Islands to be the debtor's center of main interests, based on a "totality of the circumstances" test that gave substantial weight to the two facts just noted (that the debtor was incorporated in the Caymans and carried out its restructuring there), as well as the additional facts that creditors had voted overwhelmingly

to approve the debtor's Cayman restructuring and that no party had objected to recognition. *See Modern Land,* 641 B.R. at 786-93.[10]

Thus, if the Debtor were eventually to obtain the overwhelming support of its Scheme creditors and if no party objected to recognition, *Modern Land* would provide strong precedential support for recognition of the Cayman Restructuring as a foreign main proceeding. But those are big "ifs." At present, the Debtor is very far from obtaining overwhelming creditor support or from coming to terms with the petitioning creditors.

Because the Debtor has not shown that it is likely to surmount any, let alone all, of the main hurdles its Cayman Islands restructuring faces, the prospects for the success of that restructuring appear to be remote, at least if the case continues on its current trajectory. A ruling allowing this chapter 11 case to proceed is not likely to reduce the already-low chances of a successful restructuring. To the contrary, it seems more likely that such a ruling would increase those chances—either by leading to confirmation of a chapter 11 plan in this case or, alternatively, by jump-starting the stalled negotiations in the Debtor's Cayman Islands case.

As the Debtor has conceded, Cayman Islands law gives creditors no ability to file a scheme of their own without the Debtor's support. To quote the Debtor's counsel, "the Cayman Islands court will not sanction a scheme of arrangement proposed by a creditor unless that scheme is supported by the company." Herrod Dec. [ECF No. 38] at ¶ 32. As a result, there appear to be few, if any, restrictions on the Debtor's ability to use delay as a tactic to wear down creditor opposition to its Scheme. It appears

---

[10] As the court noted, deference to the forum chosen by the debtor and supported by its creditors furthered chapter 15's stated goals, including "maximizing the value of the debtor's assets" and "promot[ing] cooperation between the American and [foreign] courts, by helping facilitate the [foreign proceeding] and maximizing the chances of a successful reorganization." *Modern Land,* 641 B.R. at 787. Moreover, the absence of any objection to recognition supported the conclusion that no party's interests were thereby impaired. *See In re Sunac China Holdings Ltd.*, 656 B.R. 715, 732-33 (Bankr. S.D.N.Y. 2024) ("creditor support for a restructuring can be entitled to significant weight, particularly if no creditor objects to the debtor's choice of restructuring forum."); *In re SphinX, Ltd.,* 351 B.R. 103, 117 (Bankr. S.D,N.Y. 2006) ("Because their money is ultimately at stake, one generally should defer . . . to the creditors' acquiescence in or support of a proposed COMI").

that the Debtor may be using delay for precisely that reason, and that if the Court were to dismiss this chapter 11 case, no meaningful check would remain on the Debtor's ability to continue doing so.[11]

In contrast, chapter 11 is well designed to limit a debtor's ability to delay. Most notably, the Debtor's exclusive right to file a plan expires if it fails to file a plan within 120 days and to obtain acceptances within 180 days, and the Court has the power to either extend or shorten these periods. *See* 11 U.S.C. § 1121(b)-(d). These provisions effectively put pressure on debtors to reorganize without undue delay, and the mere possibility of an eventual creditor plan can affect the negotiating dynamics from day one of the case. In this case, a ruling denying the motion to dismiss—and thereby giving creditors the potential right to file a chapter 11 plan if the Debtor continues to delay—could similarly have an immediate impact on the negotiating dynamics. In the best of all possible worlds, this change in the rules of the game might even break the current impasse in Scheme negotiations and lead to progress in the Cayman Islands case.

Of course, no scenario is without risk, and the Court is well aware that allowing this chapter 11 case to proceed will have costs and risks of its own. Most obviously, it will add an additional layer of expense, which could be substantial. It also could potentially lead to duplication of effort and disruption if the two cases are not properly coordinated and managed. These are serious concerns, and the Court does not take them lightly.

At present, however, the prospect of two competing cases marching forward on parallel tracks is more hypothetical than real. In the eight months since the Debtor commenced its Cayman Islands case last June, there has been no activity in that case, and the Debtor has given the Court no reason to expect this is likely to change any time soon. If this were to change—for example, if this Court's denial of the

---

[11] The Debtor argues that further delays in its Cayman Islands case will be modest, because its RSA contains an April 30, 2026 "long-stop" date by which the Scheme is required to become effective. However, the RSA expressly permits that date to be extended indefinitely, so long as "Significant Initial Consenting Creditors" agree to the extension.

motion to dismiss were to break the current impasse and lead to real progress in the Cayman Islands case—the Court would consider pausing further proceedings in this case. Specifically, the Court in that event would be receptive to a renewed abstention motion requesting a suspension of further proceedings in this case while the Debtor sought to obtain approval of the Scheme by its creditors and the Cayman Islands court. *See* 11 U.S.C. § 305(a) (court "may suspend all proceedings in a case under this title" on abstention grounds). In this way, the disruption that could result from two competing cases moving forward simultaneously could be minimized.

The Debtor asks the Court to give decisive weight to comity, but as discussed above, the case law does not support that. Moreover, in the circumstances of this case, comity appears to be a distinctly secondary consideration. This case is nothing like *Compania de Alimentos Fargo*, 376 B.R. at 434, where Judge Bernstein gave substantial deference to an Argentine debtor's decision to restructure in its own country. This Debtor, by contrast, has only minimal connections with the Cayman Islands—fewer than its connections to the United States. In addition, the Debtor only commenced its Cayman case *after* this chapter 11 case had been filed, and it has made no progress in its Cayman case over the past seven months. Any interest the Cayman Islands may have in allowing the Debtor's restructuring to continue to languish in its courts is modest at best.

The Debtor contends that allowing this chapter 11 case to proceed could cause it to suffer irreparable harm, but it has offered no evidence and few details to back up this conclusory assertion. The only possible harm the Debtor has identified is that it might lose its listing on the New York Stock Exchange. However, the Debtor has offered no persuasive explanation of how a denial of the motion to dismiss would have that effect, or of how a loss of its NYSE listing during this bankruptcy would cause significant harm to its creditors.

Finally, the Debtor contends that a chapter 11 case might face practical impediments because most of the Debtor's assets and operations are in the PRC, making any U.S. judgment potentially difficult

to enforce in the PRC. But the Debtor has provided no reason to expect that this would be any more of an issue for a U.S. reorganization than for a Cayman Islands restructuring. Either way, Debtor's counsel has acknowledged, the Debtor would honor the terms of its restructuring. And while counsel has argued that other parties affected by the bankruptcy, such as contract counterparties, might be unwilling to comply with the terms of a chapter 11 plan, counsel has not shown that non-compliance of that sort is likely to be a genuine problem, or that it would be more of a problem for a chapter 11 reorganization than for a Cayman Islands restructuring.

For all of these reasons, the Debtor has not met its burden of showing that abstention would benefit its creditors.

### 2.   The Debtor has not shown that the involuntary petition was filed for an improper purpose

The Debtor asks the Court to dismiss the involuntary petition on the ground that it was filed for an improper purpose—to gain a tactical advantage in restructuring negotiations—and serves no legitimate rehabilitative purpose. This contention lacks merit.

In the first place, the Debtor has failed to show that the Petitioning Creditors' reasons for filing the Involuntary Petition were in any way improper. The Debtor has presented no direct evidence of the Petitioning Creditors' motivations; instead, it asks the Court to infer improper motives from the circumstances. But the circumstances of this case are very different from those in the prototypical fact pattern identified by section 305's legislative history—namely, when

> an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the results of creditors in that arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment.

S. REP. NO. 95-989, at 36 (1978). The Scheme is not an out-of-court arrangement, nor has the Debtor shown that its terms would cause "no prejudice" to creditors. To the contrary, the Debtor's inability to obtain more than 30% creditor support suggests that many, perhaps most, creditors consider the Scheme

to be detrimental—prejudicial—to their interests. Nor was the Involuntary Petition filed by "a few recalcitrant creditors to provide a basis for future threats to extract full payment." *Id.* Far from seeking to extract preferential payments, the Petitioning Creditors filed under chapter 11, the confirmation requirements of which ensure that all members of any given class receive uniform treatment.

The Debtor's contention that the Involuntary Petition serves no legitimate rehabilitative purpose is also unfounded. It is undisputed that the Debtor is financially distressed and needs to restructure its debts; it filed the Scheme after being unable to pay the $170 million of senior notes that came due last January. The only question is in what forum, and under what rules, the Debtor's restructuring should take place. The filing of the Involuntary Petition served the legitimate purpose of commencing a chapter 11 case, which may well increase the prospects for a successful restructuring.

Finally, while some courts have dismissed involuntary petitions based on a finding that the petition was filed for an improper purpose, it is important to put this ground for dismissal in context. Section 305(a)(1) expressly authorizes dismissal if, but only if, "the interests of creditors and the debtor would be better served" by dismissal. 11 U.S.C. § 305(a)(1); *see also Globo Comunicacoes*, 317 B.R. at 255 (abstention "requires that both creditors and debtors benefit from the dismissal"); *id.* at 255-56 (finding not only that the petition was filed for an improper purpose but also that the debtor's and its creditors' interests "would very likely be furthered by dismissal"). In the Court's view, a finding of improper purpose is best seen not as an independent ground for dismissal, but instead as an element in the court's assessment of whether dismissal would benefit creditors. And in this case, as just discussed, the Debtor has failed to meet its burden of showing that dismissal would benefit creditors.

## II.    No Basis Exists to Dismiss This Case Under Bankruptcy Code § 1112(b)

Bankruptcy Code § 1112(b)(1) requires a bankruptcy court to dismiss a chapter 11 case, or alternatively to convert it to a case under chapter 7 or to appoint a trustee or examiner, "for cause." Code § 1112(b)(4) sets forth a non-exclusive list of circumstances that constitute cause. *See* 11 U.S.C. §

1112(b)(1), (4). Although all of the illustrative types of cause enumerated in subsection (4) involve post-petition developments, the Second Circuit has held that the filing of a bankruptcy petition—including an involuntary petition—for improper purposes also can constitute cause. *See In re Murray*, 900 F.3d 53 (2d Cir. 2018) (affirming dismissal of involuntary chapter 7 petition for cause under Code § 707(a)); *see also In re Taberna Preferred Funding IV, Ltd.*, 594 B.R. 576, 602-08 (Bankr. S.D.N.Y. 2018) (holding that filing of involuntary chapter 11 petition for improper purposes constituted cause for dismissal under Code § 1112(b)). A bankruptcy court has broad discretion to determine whether the circumstances of any given case constitute cause to dismiss. *See Taberna*, 594 B.R. at 600.

The Debtor's claim that cause exists to dismiss this case rests on the very same contentions addressed in section I.B.2 of this decision: that the Involuntary Petition was filed for an improper purpose and serves no legitimate rehabilitative purpose. As just discussed, those contentions are unfounded. Consequently, no basis exists to dismiss this case under Code § 1112(b)(1).

### III.    No Basis Exists to Dismiss This Case on *Forum Non Conveniens* Grounds

A party seeking dismissal of a case on *forum non conveniens* grounds bears a heavy burden. In addition to showing that an adequate alternative forum exists, movant must show that "the pertinent factors tilt[] strongly in favor of trial in the foreign forum." *In re Dewey & LeBoeuf LLP*, 522 B.R. 464, 476 (Bankr. S.D.N.Y 2014) (citing the private and public interest factors set forth in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947)). When, as here, movant has agreed to a New York forum selection clause—one that expressly waives any objection to suit being brought in any federal or state court in New York—the burden is even heavier. An agreement of that sort "counsels strongly against dismissal of [the] action based on *forum non conveniens.*" *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 206-07 (S.D.N.Y. 2002).

The Debtor contends that the usual burden of proof should be reversed—that is, that its choice to commence a restructuring proceeding in the Cayman Islands, rather than in New York, is entitled to deference. But this ignores that the Petitioning Creditors commenced this case first, before the Debtor filed its Cayman Islands case. Moreover, the Petitioning Creditors filed in a forum—New York—to which the Debtor had given its advance consent. In these circumstances, there is no legal basis to flip the burden of proof and require the Petitioning Creditors to show that the relevant private and public interest factors favor their chosen forum. Rather, the burden is on the Debtor to show the opposite.

The Debtor makes only a token attempt to show that the relevant private and public interest factors tilt in favor of the Cayman Islands. It does not argue that any potential witnesses live in the Caymans, nor does it identify any practical considerations or any public interest factors that might favor the Cayman Islands over New York. Instead, the Debtor argues only that its witnesses live in China, halfway around the globe from New York. But of course, this does nothing to tip the scales in favor of the Cayman Islands, which are equally far from China. The Debtor has shown no basis whatsoever to dismiss this case on *forum non conveniens* grounds.

### CONCLUSION

For these reasons, the Court will deny the Debtor's motion to dismiss the Involuntary Petition, without prejudice to the Debtor's right to seek dismissal of this case, or a suspension of further proceedings in the case, pursuant to 11 U.S.C. § 305(a)(1) at a later date if warranted by subsequent developments.

Dated: March 3, 2026
      New York, New York

/s/ *Philip Bentley*
Honorable Philip Bentley
United States Bankruptcy Judge