WOLLMUTH MAHER & DEUTSCH LLP
Paul R. DeFilippo
James N. Lawlor
Ryan A. Kane
Alexandra C. Spina
Nicholas A. Servider
500 Fifth Avenue, 12th Floor
New York, New York 10110
Tel: (212) 382-3300
Fax: (212) 382-0050
Email: pdefilippo@wmd-law.com
        jlawlor@wmd-law.com
        rkane@wmd-law.com
        aspina@wmd-law.com
        nservider@wmd-law.com

*Counsel for Cithara Global Multi-Strategy SPC-Bosideng Industry Investment Fund SP, Star Freight & Trading Co., Limited, and Mars Partner Limited.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| XINYUAN REAL ESTATE CO., LTD., | Case No.: 25-10745-pb |
| Alleged Debtor. | |

**THE PETITIONING CREDITORS' PRE-HEARING BRIEF**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ........................................................................................................................3

    A.  Alleged Debtor's Issuance of Notes .........................................................................3

    B.  Petitioning Creditors' Notes ....................................................................................3

         i.  Cithara-Bosideng ............................................................................................4

        ii.  Mars Partner....................................................................................................5

      iii.  Star Freight.......................................................................................................6

    C.  Alleged Debtor Has Not Paid Amounts Due on the Notes........................................7

    D.  Petitioning Creditors Obtain Authorizations to File Involuntary Petition...........................7

    E.  The Petition...............................................................................................................8

    F.  Alleged Debtor's Unsuccessful Cayman Restructuring ...........................................8

    G.  Alleged Debtor's Motion to Dismiss Is Denied........................................................9

    H.  Alleged Debtor Files HK Writ of Summons and Serves Expert Report............................9

    I.  Petitioning Creditors' Expert Rebuttal Report.......................................................10

    J.  The Alleged Debtor's Bad Faith Attempts to Obstruct This Proceeding ..........................11

ARGUMENT.............................................................................................................................13

  I.  The Petitioning Creditors Satisfy the Requirements of Section 303(b)............................13

  II.  The Alleged Debtor's Affirmative Defenses Are Meritless. ............................................14

    A.  The Court Previously Rejected the First, Sixth, Seventh, and Eighth Defenses. ..14

    B.  The Second Affirmative Defense Lacks Merit as Petitioners Have Standing.......16

    C.  Alleged Debtor's Hong Kong Proceeding Is Procedurally Defective, Substantively Meritless, and a Disingenuous Ploy to Manufacture a Bona Fide Dispute. ..........17

        i.  The Purported "Offset" Relates to a Separate Investment Portfolio Involving Neither Petitioners Nor Debtor, Thus Failing to Establish a Bona Fide Dispute. ..................................................................................17

        ii.  The HK Proceeding Is Objectively Meritless. .........................................21

    D.  The Fourth and Fifth Affirmative Defenses Lack Any Support...........................25

CONCLUSION..........................................................................................................................25

# TABLE OF AUTHORITIES

Cases                                                                                                    Page(s)

*Crest One SpA v. TPG Troy, LLC (In re TPG Troy, LLC)*,
   793 F.3d 228 (2d Cir. 2015) ................................................................................ 17

*In re 35th & Morgan Dev. Corp.*,
   510 B.R. 832 (Bankr. N.D. Ill. 2014) .................................................................. 22

*In re Arcapita Bank B.S.C.(c)*,
   628 B.R. 414 (Bankr. S.D.N.Y. 2021) ................................................................. 18

*In re ArtiusID, Inc.*,
   673 B.R. 340 (Bankr. W.D. Tex. 2024) ................................................................ 22

*In re Euro-American Lodging Corp.*,
   357 B.R. 700 (Bankr. S.D.N.Y. 2007) ................................................................. 20

*In re Focus Media, Inc.*,
   378 F.3d 916 (9th Cir. 2004) ............................................................................... 20

*In re Hentges*,
   350 B.R. 586 (Bankr. N.D. Okla. 2006) .............................................................. 21

*In re Honolulu Afford. Housing Partners, LLC*,
   2015 WL 2203473 (D. Haw. May 7, 2015) .......................................................... 21

*In re Lehman Bros. Inc.*,
   458 B.R. 134 (Bankr. S.D.N.Y. 2011) ................................................................. 18

*In re Manolo Blahnik USA, Ltd.*,
   619 B.R. 81 (Bankr. S.D.N.Y. 2020) ............................................................. 17, 20

*In re Naturescape Holding Group Int'l Inc.*,
   2018 WL 650198 (D. Haw. Jan. 31, 2018) .......................................................... 22

*In re Refco Inc. Sec. Litig.*,
   2013 WL 12158585 (S.D.N.Y. July 10, 2013) ..................................................... 19

*In re Ross*,
   63 B.R. 951 (Bankr. S.D.N.Y. 1986) ................................................................... 25

*In re Seko Inv., Inc.*,
   156 F.3d 1005 (9th Cir. 1998) ........................................................................ 20, 21

*In re Speer*,
    522 B.R. 1 (Bankr. D. Conn. 2014) ....................................................................... 14

*U.S. Fidelity & Guar. Co. v. DJF Realty & Suppliers, Inc.*,
    58 B.R. 1008 (N.D.N.Y. 1986) .............................................................................. 15

*VFB LLC v. Campbell Soup Co.*,
    482 F.3d 624 (3d Cir. 2007) ................................................................................... 7

Statutes

11 U.S.C. § 303 .............................................................................................................*passim*

Rules

Fed. R. Bankr. P. 1003 ........................................................................................... 14, 15

Cithara Global Multi-Strategy SPC – Bosideng Industry Investment Fund SP ("Cithara-Bosideng"), Star Freight & Trading Co., Limited ("Star Freight"), and Mars Partner Limited ("Mars Partner" and, together, "Petitioning Creditors" or "Petitioners")[1] respectfully submit this Pre-Hearing Brief.

## PRELIMINARY STATEMENT

The undisputed facts demonstrate that the Petition satisfies the requirements of Section 303 and justify entry of an order for relief. Xinyuan Real Estate Co., Ltd. ("Alleged Debtor") has stipulated to or otherwise admitted many of those facts. Alleged Debtor has stipulated that it is not and cannot pay its debts as they come due and that Petitioners' Notes (as hereinafter defined) are unsecured to the extent necessary to meet the Section 303 threshold. Ex. 1 (Stipulation) ¶¶ 2, 3.[2] Alleged Debtor admitted in the Petition for the Caymans Scheme of Arrangement (Ex. 2) ("Cayman Petition") that it is unable to pay its outstanding notes, including those held by Petitioners, representing a substantial portion of Alleged Debtor's indebtedness, all of which are in default. Ex. 2 at §§ 4, 19-20. Ignoring its admitted restructuring need and inability to effectuate one elsewhere, Alleged Debtor seeks to dismiss the Petition based on unsubstantiated affirmative defenses attacking Petitioners' standing, notwithstanding that they are three separate entities holding over $65 million of indebtedness.

Alleged Debtor's primary arguments are: (i) Petitioning Creditors are improperly using the bankruptcy court; and (ii) Cithara-Bosideng's debt must be disqualified because it is allegedly subject to an offset based on unrelated counterclaims not even held by the Alleged Debtor resulting in a bona fide dispute as to liability or amount. Alleged Debtor fails to meet its burden that

---

[1] Capitalized terms not defined herein shall have the meaning ascribed in the Involuntary Petition [Dkt. 1] ("Petition").

[2] All exhibits referenced in this brief (*e.g.*, 'Ex. [X]') refer to the exhibits attached to the declaration of Paul R. DeFilippo ("DeFilippo Decl.") and made a part hereof.

dismissal is warranted on these or any other grounds.

First, the Court already rejected Alleged Debtor's assertions concerning improper use of the bankruptcy court in its decision denying dismissal ("MTD Decision") [Dkt. 43]. Discovery confirmed that each Petitioner purchased Notes for business or investment purposes, not for the purpose of bringing a bankruptcy petition. *See infra* § B(i)-(iii). Further, there is nothing improper about Petitioners working together to commence a proceeding. If such conduct constitutes bad faith, then every three-creditor involuntary petition would likely be in bad faith, as creditors necessarily must work together to file. Moreover, this proceeding is entirely justified as Alleged Debtor admits it is not paying a majority of its debts as they come due and requires restructuring, and, as the Court already found, dismissal would not benefit creditors. MTD Decision at p. 25.

Second, Alleged Debtor's facially deficient claims against Cithara entities, filed in Hong Kong just a few weeks ago, fail as a matter of law. The purported claims arise from the alleged loss by a third party Hong Kong investment company, Valuable Capital Limited ("Valuable Capital"), in connection with Valuable Capital's (not Alleged Debtor's) investment in a segregated portfolio fund unrelated to the portfolio holding the Notes underlying this Petition. Those unrelated portfolio claims have not been, and cannot be as a matter of law, asserted as an offset to separate claims arising from the segregated Bosideng fund's investment in the Notes. Indeed, the "offset" arises from Alleged Debtor's *subsidiary's* secret and unwritten agreement with Valuable Capital—the only entity that executed a subscription agreement with a Cithara fund, albeit a legally separate fund portfolio—to try to artificially boost the price of Alleged Debtor's bonds. Indeed, Alleged Debtor's own documents establish that its subsidiary, Xinyuan Real Estate Ltd. ("XRE"), was the indirect investor in the unrelated fund, not Alleged Debtor. On their face, the "counterclaims" lack the mutuality required to be an offset, do not arise out of the same transaction as issuance of the

Petitioners' Notes, and are insufficient as a matter of law to create a bona fide dispute as to either the validity or amount of Petitioners' claims. As demonstrated further below, Alleged Debtor's defenses should be rejected, and the Court should enter an order for relief.

## BACKGROUND

Alleged Debtor is a company that until recently was listed on the NYSE and operates through subsidiaries to invest in and develop real estate properties across the globe, including New York. It regularly issued debt governed by New York law to finance its investments. Recently, a US-based subsidiary of Alleged Debtor filed a Chapter 11 petition in the Eastern District of New York, and in that case the Alleged Debtor made some damaging admissions described below.

### A.  Alleged Debtor's Issuance of Notes

On January 25, 2021, Alleged Debtor, as the issuer, executed an indenture with Citicorp International Limited, as trustee ("Indenture"), pursuant to which Alleged Debtor issued notes in an aggregate principal amount of $170,000,000 ("Notes"). Ex. 3 at 1 (Recitals); § 2.01. The Notes matured and became due and payable in full on January 25, 2024 ("Maturity Date"). *Id.* at § 1.01 (definition of "Final Maturity Date"). Alleged Debtor admits that it has not paid the principal and interest owed on the Notes. Ex. 4 at Nos. 6, 10 (RFA Responses). *See also* Ex. 2 (Cayman Petition).

### B.  Petitioning Creditors' Notes

Petitioners are holders of claims against Alleged Debtor on account of the Notes in the aggregate principal amount of at least $65,800,000 (plus applicable interest, fees, and other charges) as set forth below:

| Petitioning Creditor | Cithara-Bosideng | Mars Partner | Star Freight |
| --- | --- | --- | --- |
| Note Holdings | $58,500,000 | $300,000 | $7,000,000 |

Each of the Petitioners is an independent entity that purchased the Notes for business or investment

3

purposes.

### i. Cithara-Bosideng

Cithara Global Multi-Strategy SPC – Bosideng Industry Investment Fund SP (previously defined as "Cithara-Bosideng") is a Cayman Islands-registered segregated portfolio company that maintains a number of segregated portfolios, including the Bosideng Industry Fund SP ("Bosideng SP"), which holds the Notes underlying this Petition. Ex. 5 (CITHARA0000001). It maintains other segregated portfolios, including the Cithara Global Multi-Strategy SPC Series 3 SP fund ("Series 3 SP"). Exs. 6 (CITHARA0000046 at 53), 7 ("Offering Memorandum", CITHARA0000093 at 110); 10 (CITHARA0000002); 40 (Series 3 SP Supplemental Offering Memorandum, CITHARA0000153). Series 3 SP, the portfolio in which Valuable Capital invested (which investment is the foundation of Alleged Debtor's Hong Kong claims), is a segregated portfolio distinct from Bosideng SP. Ex. 7 (Offering Memorandum, CITHARA0000093 at 100-101, 110-111, 138-139). Consequently, Series 3 SP maintains assets and liabilities separate from other segregated portfolios, and investors in Series 3 SP were clearly informed that any subscriber of its shares cannot recover for a claim against the assets of any other segregated portfolio, including Bosideng SP. Ex. 7 at CITHARA0000100, 110-11.

Cithara-Bosideng currently holds Notes in the aggregate amount of at least $58,500,000. Dkt. 1, Ex. B (Decl. of Zhang Jun), which were originally purchased for the benefit of the investors in the Series 3 SP in January 2021. The Series 3 SP fund was subscribed to by Valuable Capital. Ex. 10 (CITHARA0000002 at 011) ("Series 3 Subscription Agreement"). The Series 3 SP fund borrowed against the Notes, as it was permitted to do by the Offering Memorandum, in the amount of $40,000,000. Exs. 7 (CITHARA0000093, at 112, 114), Ex. 11 (XINDEBTOR00000001 at 017), Ex. 12 at ¶ 5(d) (HK Writ). The Notes were pledged to lenders to Series 3 SP as collateral for loans

4

used to finance the Note purchase. Exs. 11 (XINDEBTOR00000001, at 003), 13. As Alleged Debtor defaulted on the Notes, it rendered the portfolio insolvent, and the Series 3 SP shares lost all of their value. The lenders foreclosed on the Note collateral, and Cithara-Bosideng thereafter purchased the Notes from the lenders for the Series 3 SP portfolio. *See* Ex. 14 (CITHARA0000003290); Ex. 15 (CITHARA0000003317); Ex. 16 (J. Zhang Dep. Tr. at 23:15-25:11, 62:13-74:14).

Zhang Jun, the director responsible for Cithara-Bosideng's acquisition and commencement of this proceeding, testified that he had no contact with the other Petitioners before they purchased their Notes, and his first contact with them about the Notes was when they had discussions with their Hong Kong lawyers – all well after their purchases. Ex. 16 (J. Zhang Dep. Tr. at 91:14-94:7.

### ii.    Mars Partner

Mars Partner acquired Notes in the aggregate amount of at least $7,000,000 on or about February 23, 2024, for investment purposes. Dkt. 1, Ex. D (Decl. of Song Yan). Mars Partner is owned by Song Yan and invests in diverse types of investments, including bonds. Ex. 17 (Y. Song Dep. Tr. at 15:22-16:6). Mars Partner invested in the Notes at a very low price with the goal of profiting if the price rebounded. *Id.* at 24:6-25:17. Song Yan was familiar with Alleged Debtor and understood they were "involved in many, many projects." *Id*. at 24:18. Before purchasing the Notes, Song Yan "heard positive news about [Xinyuan]" and that "they might have a good chance of reorganization, or maybe with injection of help from the outside." *Id*. at 25:8-12. Song Yan explained that "the bond prices was (sic) rock bottom low" so "it looked like a good bet to double my investment." *Id.* at 25:13-17. When the price of the Notes did not rebound, Song Yan contacted Mars Partner's broker and the broker referred him to Hong Kong lawyers to discuss his Notes. *Id.* at 36:14-39:21; 46:15-21. Song Yan never spoke or communicated with Star Freight until meeting

them through the same lawyers. *Id.* at 45:21-46:8. Song Yan likewise did not communicate with Zhang Jun concerning the Notes until he met him around the same time as Star Freight though the lawyers. *Id*. at 48:11-48:25.

### iii.    Star Freight

Star Freight is a company owned by Zhu Yu Xiang that engages in international freight shipping and invests in bonds and stocks depending on its cash flow and balance sheet. Ex. 18 (X. Zhu Dep. Tr. at 11:2-17, 17:25-18:12, 58:18-59:8). Star Freight acquired Notes in the aggregate amount of $300,000 on or about April 19, 2024, for investment purposes. Dkt. 1, Ex. F (Decl. of Zhu Yu Xiang). Star Freight considered multiple factors when deciding to invest, including "the underlying situation" for Alleged Debtor, "whether government policies, in terms of the real estate market, were helping the situation, or how the company themselves were doing, in terms of helping themselves getting out of the situation," and "whether these defaulted bonds had perhaps hit a low point." Ex. 18 (X. Zhu Dep. Tr. at 39:19-40:17). And, as explained by Zhu Yu Xiang, "[d]efaulted bonds would have outsized returns," and he "was just trying to use minimum cost, to make the highest return." *Id*. at 37:21-22, 44:14-16. When the price continued to drop, Star Freight attempted to sell the Notes, but the prices were "horrible," and the sale attempts were unsuccessful. *Id.* at 57:3-21. Zhu Yu Xiang explained that "the market was not looking good, and it was going down and down, and it was different from the original - what I thought the original investment would bring. So then I started looking for my regular broker. . . . I looked up my broker and then . . . for ways to handle or to process the bonds, and then the brokers, subsequently, arranged or introduced attorneys." *Id*. at 28:22-29:10; 41:13-25. Zhu Yu Xiang never communicated with Mars Partner before purchasing, communicating for the first time during discussions with the Hong Kong attorneys. *Id*. at 27:12-28:18. He never had any business dealing with Mars Parter and did not

6

know them before bringing the Petition. *Id*. at 30:25-31:10. He also had no communications with Cithara-Bosideng before discussions with the attorneys. *Id*. at 48:10-15.

Zhu Yu Xiang explained that "at the time, in Hong Kong, there were a lot of these similar defaulted bonds products in the marketplace, and that if they could reorganize or have the potential, then, the return profit would be substantial." *Id.* at 43:25-44:7. Star Freight utilized the same distressed investment strategy for another bond it holds issued by another Chinese real estate company, Sino Ocean, which had a successful reorganization in England. *Id.* at 61:3-66:24.

### C. Alleged Debtor Has Not Paid Amounts Due on the Notes

The Indenture required Alleged Debtor to repay the principal and any unpaid and accrued interest on the Notes on the Maturity Date. Ex. 3 at § 1.01 (definition of "Final Maturity Date"). Alleged Debtor failed to make the required payment on the Maturity Date and has not paid interest since 2022. It does not dispute this and has conceded its failure to pay. Ex. 4 at Nos. 6, 10 (RFA Responses). Alleged Debtor also admits that the Petitioning Creditors' Notes are under secured by at least $21,050. *See id.* at Nos. 1, 2, 15, 18; Ex. 1 (Stipulation) ¶ 2. The Court may also take into consideration market prices of the Notes as of the Petition date to determine their value and the implied value of any collateral. *See VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 632-33 (3d Cir. 2007). The Notes' market prices reflected the fact that the collateral (stock in certain subsidiaries of Alleged Debtor), Ex. 3 at § 1.01 (definition of "Collateral"), has no or limited value (*see* Ex. 18 (X. Zhu Dep. Tr.) at 57:8-21), and the Court may make a finding that the Notes are sufficiently undersecured to meet the Section 303(b)(1) threshold of $21,050 in the aggregate.

### D. Petitioning Creditors Obtain Authorizations to File Involuntary Petition

As set forth below, Petitioning Creditors obtained consent from Euroclear, the registered holder of the Notes, to file the Petition. Exs. 19, 20, 21 ("Euroclear Authorizations"); *infra* § II(b).

7

### E.  The Petition

On April 14, 2025, Petitioners filed the Petition to reorganize Alleged Debtor under Chapter 11. As set forth above, Petitioning Creditors are holders of claims against Alleged Debtor on account of the Notes in the aggregate amount of at least $65,800,000.

Alleged Debtor admits it is not paying a majority of its indebtedness as it becomes due. The outstanding notes identified in the Cayman Petition are all due and owing and unpaid. Alleged Debtor's most recent financial statements[3] establish "the existence of material uncertainty which cast substantial doubt on [its] ability to continue as a going concern." Ex. 22 at F-19. Alleged Debtor has failed to make payments for senior notes, which "triggered cross-default of other senior notes issued." *Id.* "The carrying amount of senior notes still in default was US$391.9 million as of December 31, 2024." *Id.* at F-19; *see also* Ex. 4 at Nos. 6-10 (RFA Responses). "[Alleged Debtor] also breached certain covenants relating to borrowings of US$409.9 million as of December 31, 2024" and "continues to be in breach of certain covenants and other lenders have not demanded immediate repayment of other borrowings." Ex. 22 at F-19. The balance sheet shows that its shareholder deficit has grown to $104 million, while its profit and loss statement shows a net loss of over $51 million. *Id.* F-7, F-8. Meanwhile, Alleged Debtor's cash and cash equivalents declined from $129 million to $94 million. *Id.* F-6. Alleged Debtor's cash is grossly inadequate to satisfy its defaulted debt, and its operations are not producing positive cash to enhance its payment ability.

### F.  Alleged Debtor's Unsuccessful Cayman Restructuring

On May 27, 2025, just prior to Alleged Debtor's deadline to respond to the Petition, Alleged Debtor announced its plan to pursue a scheme of arrangement pursuant to section 86 of the Cayman Islands Companies Act. Ex. 23 (May 27, 2025 Form 6-K). According to Alleged

---

[3] The Alleged Debtor's most recent annual financial statements are for the period ending December 31, 2024 and were publicly filed with the SEC on April 29, 2025. Ex. 22 (Form 20-F).

Debtor, the expected effective date for the restructuring would be December 15, 2025, *see id.*, and the longstop date of the proposed restructuring by which time all necessary steps to complete the restructuring must be completed was April 30, 2026. Dkt. 34 at n.5. As of this date, there has been no vote on the scheme, and no restructuring has taken place by the April 30, 2026 deadline presented by Alleged Debtor. Ex. 24 (Y. Zhang Dep. Tr. at 33:11-35:11).

At roughly the same time it announced the Cayman scheme of arrangement, Alleged Debtor also announced a proposed spinoff of some of its assets located in China, effectively seeking to isolate those assets from the claims in this case without any control over that process by this or any other Court. Ex. 23 (May 27, 2025 Form 6-K). It has not publicly commented on or confirmed the results of its proposed spinoff since July 29, 2025. Ex. 25 (July 29, 2025 Form 6-K). According to Board member Haifei He, Alleged Debtor is actively pursuing the spinoff, even though it has met resistance from creditors. Ex. 26 (H. He. Dep. Tr. at 35:16-37:17).

### G. Alleged Debtor's Motion to Dismiss Is Denied

On November 26, 2025, Alleged Debtor filed a motion to dismiss the Petition on three grounds: (i) improper use of bankruptcy court, (ii) abstention, and (iii) forum non conveniens. Dkts. 30, 31. On March 3, 2026, the Court denied the motion in its entirety. Dkts. 43, 44.

### H. Alleged Debtor Files HK Writ of Summons and Serves Expert Report

On May 14, 2026, Alleged Debtor produced a Writ of Summons that appears to have been submitted to a Hong Kong court on May 14, 2026 ("HK Writ" or "HK Proceeding"). The HK Writ was submitted by Chan King Wong Johnny on the same day he submitted a declaration here summarizing the purported claims in the writ ("Chan Decl.").[4] The HK Writ asserts claims against

---

[4] The original deadline for expert reports was May 11, 2026. Alleged Debtor requested an extension until May 14, 2026, to which the Petitioning Creditors consented without knowing the apparent reason for the extension was to allow the Alleged Debtor to file the HK Writ. DeFilippo Decl. ¶ 44.

Valuable Capital and Cithara entities arising out of third-party Valuable Capital's purchase of segregated portfolio Series 3 SP shares pursuant to a subscription agreement governing only that segregated fund. *See* Ex. 12 at ¶¶ 4-6 (HK Writ); Ex. 10 ("Series 3 Subscription Agreement"). The HK Writ alleges that plaintiffs, XRE and Alleged Debtor, were induced by Valuable Capital to enter into the transaction. Ex. 12 at ¶¶ 5-6 (HK Writ). Further, defendants allegedly breached their fiduciary duties and/or contractual obligations by failing to notify plaintiffs before effecting a "forced liquidation" of the fund. *Id.* at ¶ 11 (HK Writ). However, Cithara-Bosideng owes no contractual obligations or fiduciary duties to Alleged Debtor, as is obvious from a review of the HK Writ.

## I.   Petitioning Creditors' Expert Rebuttal Report

On May 26, 2026, Petitioners served the declaration of Jiang Qian in response to the Chan Declaration ("Jiang Decl."). The Jiang Declaration establishes that as of the date of his declaration the HK Writ had not been effectively commenced because (i) it has not been stamped with the seal of the High Court of Hong Kong, (ii) an action number has not been issued, and (iii) it has not been formally served on defendants as required under Hong Kong procedural rules. *See* Ex. 27 (Jiang Decl.) at ¶¶ 9-15.[5] The Jiang Declaration further opines that (i), the HK Writ does not assert any claim against Cithara-Bosideng or any other Petitioning Creditor, *id.* at § II; (ii) there is no privity of contract between the Alleged Debtor and the purported defendants in the HK Proceeding because Valuable Capital is the subscriber under the Series 3 Subscription Agreement, and nothing in that agreement grants any third parties, such as the Alleged Debtor, any rights with respect to Series 3 SP or the Series 3 Subscription Agreement, *id.* at § III; and (iii) the claims themselves are without merit as they are based on rights that do not exist under the Series 3 Subscription

---

[5] The HK Writ appears to have been filed, but not served, after the Jiang Declaration. *See* Dkt. No. 63-9.

Agreement, *id.* at § V.

### J.   The Alleged Debtor's Bad Faith Attempts to Obstruct This Proceeding

During this proceeding, Alleged Debtor has made misleading or false statements to the public and to the Court in an effort to delay or avoid a ruling. For example, just a week after the Petition filing, Alleged Debtor falsely stated in its April 21, 2025 Form 6-K filing that it had reached a "settlement" with the Petitioners. Ex. 28. The 6-K signatory, Alleged Debtor's chairman, admitted in his deposition that no such settlement was reached. Ex. 24 (Y. Zhang Dep. Tr. at 43:18).

As the Court is aware, Alleged Debtor filed the Cayman Petition shortly after this case was commenced, asserting it anticipated reaching the 75% creditor acceptance required as grounds for dismissal or abstention. In public 6-K filings between April 25 and June 16, 2025, it reported wild swings in the percentage of accepting creditors, starting at 30%, jumping a week later to 45%, dropping a few weeks later to 25%, and finally ending up at 33%. Exs. 29, 30, 23, 31. In the November 2025 Zhang Declaration, Alleged Debtor asserted acceptances of under 32%. Ex. 32. The swings are especially odd given that creditor acceptance is supposed to be irrevocable. Ex. 41 at § 3.1 (RSA). When deposed, the Chairman offered no explanation for the swings or where acceptances stood today, except to concede that the scheme had failed as it was being modified. Ex. 24 (Y. Zhang Tr. at pp. 34-37). Yet Alleged Debtor never advised the Court, there appear to be no public filings detailing the alleged modifications, and it produced no evidence of the same.

More concerning is the advancement of a "parallel" process to "spinoff" the bulk of its assets, which are in mainland China. Ex. 23 (May 27, 2025 6-K). Alleged Debtor has refused to provide the details of this "spinoff", despite it being clearly intended to denude the estate of assets. When asked about the spinoff's status, the Chairman could not or would not provide any clarity other than it was continuing. Ex. 24 (Y. Zhang Dep. Tr. at pp. 36-38).

The spinoff also highlights the Alleged Debtor's misleading pleadings here regarding its assets. In the Zhang Declaration supporting dismissal, Alleged Debtor asserted that it had no "direct tangible assets" in the U.S.  Ex. 32 at ¶ 12. Yet, a May 2026 Chapter 11 filing involving real property in the Eastern District of New York, *In re: Queens Theatre*, 26-42258-ess (Bankr. E.D.N.Y.), contains Alleged Debtor's Chairman signature for the debtor-in-possession and identifies under oath that Alleged Debtor is the "parent" of the filer. Ex. 33 at p. 2. In a separate litigation in the New York state court, *Guarantee Company of North America USA v. XIN Development Group Int'l, Inc.*, Index No. 654742/2023 (Sup. Ct. New York County), in response to a civil contempt motion, the Chairman executed a March 2026 affidavit in English in which he disclosed what are likely multiple asset-owning subsidiaries or affiliates, including entities generating cash being collected by the Chairman or entities he controls. Ex. 34 at ¶¶ 22-23.

The Chairman's deposition testimony did not dispel the misrepresentations and misstatements. Rather, in response to simple questions, deponent often gave evasive answers, such as the Petitioners' identities, Ex. 24 (Y. Zhang Dep. Tr. at pp. 10-11), or refused to answer outright, such as whether Alleged Debtor is the issuer of the Notes (*Id.* at pp. 20-21).

While Alleged Debtor may assert that misstatements and nonanswers arise from the Chairman not being a native English speaker, that is simply not the case. He has executed multiple declarations and affidavits in English that he purportedly understood. Second, even when provided with a Chinese language document, he often obfuscated or refused to answer. The Chairman's testimony as to the HK Writ evidences his gamesmanship. When asked if he was aware of that action, he indicated he was. Ex. 24 (Y. Zhang Dep. Tr. at pp. 33-34). Yet, when handed the copy of the HK Writ, the Chairman claimed that without his signature he could not discuss its contents. (*Id.* at pp. 25-26). When pressed to give his personal understanding, he refused to answer. (*Id.* at

pp. 26-28 29-31). Even when pressed for simple explanations, such as the relationship of Alleged Debtor and XRE named in the HK Writ, he would not answer. (*Id.* at pp. 49-54).

Another example involves testimony regarding the May 2025 internal audit report. Ex. 11. After testifying he usually reviewed such reports and had not found any incomplete or inaccurate (*Id*. at pp. 65-66), when asked to address the Chinese version of the May report, the Chairman simply refused (*Id.* at pp. 71-72). The only conclusion can be that the Chairman wished to avoid discussing the damaging references to the fact that a non-debtor subsidiary was the Series 3 SP indirect investor and neither Alleged Debtor nor XRE had any signed documents from either Valuable Capital or Cithara that supported the claims being made in the HK Writ.

## ARGUMENT

### I.    The Petitioning Creditors Satisfy the Requirements of Section 303(b).

Petitioning Creditors are eligible under Section 303(b) to bring the Petition. Section 303(b) of the Bankruptcy Code provides:

> An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title . . . by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such holder, if such noncontingent, undisputed claims aggregate at least $21,050 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims.

11 U.S.C. § 303(b). The three Petitioners have established a prima facie case that they hold matured, unpaid Notes in the amount of at least $65,800,000 that are undersecured by at least $21,050, and that are also not subject to a bona fide dispute as to liability or amount. As set forth above, *supra* p. 7, Alleged Debtor admits "that Petitioning Creditors' claims are undersecured by at least $21,050 for purposes of the Petition." Ex. 1 (Stipulation) ¶ 2. As a result, there is no bona fide dispute as to the amounts due and that Alleged Debtor failed to pay. Indeed, Alleged Debtor admitted that it generally is failing to pay its debts when they become due. *Id.* ¶ 3. And the Alleged

Debtor has acknowledged its need for restructuring through its stalled Cayman Petition.

In short, Petitioners are eligible under Section 303(b) to bring the Petition. Alleged Debtor generally is not paying its debts when due, and Alleged Debtor requires restructuring.

## II.    The Alleged Debtor s Affirmative Defenses Are Meritless.

### A.    The Court Previously Rejected the First, Sixth, Seventh, and Eighth Defenses.

Alleged Debtor asserts that Petitioners filed the Petition for an improper purpose (First Affirmative Defense), Petitioning Creditors violated Federal Rules of Bankruptcy Procedure 1003 (Sixth Affirmative Defense), and that the interests of creditors would be better served by dismissal or through the Cayman Petition (Seventh and Eighth Affirmative Defenses). The Court already rejected each of these defenses. Dkt. 43. As Alleged Debtor asserts no grounds for reconsideration (as there are none), the Court should reject them on the same grounds it did previously.

Nonetheless, even if the Court considers such arguments again, each is without merit as confirmed by fact discovery. As to the First Affirmative Defense, "there is a presumption that an Involuntary Petition was filed in good faith." *In re Speer*, 522 B.R. 1, 10 (Bankr. D. Conn. 2014). As here, "[g]ood faith is exemplified" by "compliance of the Petitioning Creditors with the requisites of Section 303(b)." *Id.* It is the Alleged Debtor that "bears the burden of showing, by a preponderance of the evidence, that the Involuntary Petition was filed in bad faith." *Id*.

Here, there is no evidence that Petitioners filed the Petition for an improper purpose. The evidence shows that the Petitioners are separate entities that purchased their Notes for their own business reasons. *See supra* § B(i)-(iii). The evidence further shows that the Petitioners had no contact with each other before their acquisitions, communicating with each other for the first time when their broker put them in touch with lawyers to discuss potential ways to address the sinking bond prices and nonpayment. *See id.* There, of course, is nothing improper about creditors

14

contacting each other and eventually deciding to bring an involuntary petition. After all, an involuntary petition could never be filed if there were prohibitions on creditors coordinating as three separate creditors are required to bring most cases. Critically, this case begs for an order of relief. Alleged Debtor has admitted it is not generally paying its debts, acknowledged it needs to restructure, and the Court already found that dismissing this action would not benefit creditors. Ex. 1 (Stipulation) ¶ 3; MTD Decision at p. 3, 25. *See U.S. Fidelity & Guar. Co. v. DJF Realty & Suppliers, Inc.*, 58 B.R. 1008, 1013 (N.D.N.Y. 1986) ("What better motive for filing . . .than that the alleged debtors are not paying their debts as they become due?") And now creditors face an undisclosed spinoff of substantial assets that threatens to insulate those assets from their claims. Far from being an improper use, bankruptcy under these circumstances (and devoting Petitioners' time and money to doing so) was entirely proper and will benefit all creditors.

As for the Sixth Affirmative Defense, there is no evidence that Petitioners purchased the Notes for the purpose of bringing a bankruptcy proceeding in violation of Rule 1003. Under Rule 1003, "[a]n entity that has transferred or acquired a claim for the purpose of commencing an involuntary case under Chapter 7 or Chapter 11 is not a qualified petitioner." Fed. R. Bankr. P. 1003(a). Here, fact discovery has confirmed that each Petitioner purchased the Notes for business or investment purposes. *See supra* § B(i)-(iii). In short, none of the Petitioners purchased the Notes to bring a bankruptcy proceeding.

The Seventh and Eighth Affirmative Defenses also are without merit as Alleged Debtor has admitted that it cannot pay its debts as they become due, Ex. 1 (Stipulation) ¶ 3, and the Alleged Debtor, at a minimum, is in need of restructuring, and Alleged Debtor's attempts to restructure through its Cayman Petition have been a failure. Despite repeated representation that its Cayman Petition would achieve the requisite amount of creditor support, that support has never

15

materialized. And since the filing of the motion to dismiss, the longstop date for consummation of the Cayman restructuring has expired without reaching the requisite support. *See supra* at pp. 8-9.

**B. The Second Affirmative Defense Lacks Merit as Petitioners Have Standing.**

As the beneficial holders of the Notes, Petitioners are authorized to bring the Petition. The Notes are held through the Euroclear System, operated by Euroclear Bank SA/NV ("Euroclear"). The Notes' offering memorandum (Ex. 35) ("Xinyuan Offering Memorandum") incorporates the Euroclear System's Operating Procedures as of May 2026 (Ex. 36) (the "Euroclear Operating Procedures")[6], which authorize beneficial holders to bring claims.[7] Here, Euroclear provided authorizations to the Petitioners to bring claims, consistent with the general authorization in its operating procedures. Exs. 19, 20, 21 (Euroclear Authorizations). The Euroclear Authorizations indicated: "STATEMENT OF ACCOUNT FOR THE PURPOSE OF LIQUIDATION/BANKRUPTCY CLAIM." Euroclear Authorizations (emphasis in original). In the Euroclear Authorizations, Euroclear confirmed:

> We authorize, in accordance with our Operating Procedures of the Euroclear System, the underlying Beneficial Owner of the abovementioned security to maintain proceedings against issuers, guarantors and any other parties. This is to the extent that we, our nominee, a Depository or their nominee acts as registered owner of any security held in the Euroclear System, or in any other relevant situation.

*See* Euroclear Authorizations (Exs. 19-21). Citibank Europe plc ("Citibank"), as the common depositary for Euroclear, has "confirm[ed] that Citibank has no role in the administration of the Euroclear Operating Procedures" and has not objected to Euroclear's authorizations. Ex. 38 (Citibank Email).

---

[6] The operative language in the Euroclear Operating Procedures has been substantially similar since at least October 2020. *Compare* Ex. 36 *with* the Operating Procedures of the Euroclear System as of October 2020 (Ex. 37).
[7] Ex. 36 at § 5.3.1.3(a) (Euroclear Operating Procedures).

**C. Alleged Debtor s Hong Kong Proceeding Is Procedurally Defective, Substantively Meritless, and a Disingenuous Ploy to Manufacture a Bona Fide Dispute.**

As shown above, there is no bona fide dispute as to claims of over $65 million and for nonpayment of the amounts owed. *See supra* pp. 10-11. Alleged Debtor has also admitted that it is unable to pay its debts as they become due and that the Notes are undersecured by at least $21,050. Ex. 1 at ¶¶ 2-3 (Stipulation); Ex. 4 at Nos. 1-2, 6, 8-10 (RFA Responses). Unable to contest that all statutory requirements are met, Alleged Debtor manufactured list-minute claims for an offset in its Fifth Affirmative Defense. The Court should reject the defense as without merit.

Alleged Debtor contends the claims in the HK Writ render Cithara-BosidengP's debt subject to a bona fide dispute. Courts in the Second Circuit apply an objective test as to whether there is a bona fide dispute. According to that test:

> 'A court must determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt. There is a bona fide dispute if there is either a genuine issue of material fact that bears upon the debtor's liability or a meritorious contention as to the application of law to undisputed facts . . . . The petitioning creditor bears the initial burden of coming forward with evidence to establish a prima facie case that no bona fide dispute exists. Once a prima facie case has been established, the burden shifts to the debtor to demonstrate the existence of a bona fide dispute. '

*In re Manolo Blahnik USA, Ltd.*, 619 B.R. 81, 91 (Bankr. S.D.N.Y. 2020) (quoting *Crest One SpA v. TPG Troy, LLC (In re TPG Troy, LLC)*, 793 F.3d 228, 234 (2d Cir. 2015)). Alleged Debtor cannot meet its burden as the HK Proceeding fails to create a bona fide dispute over the nonpayment of the Notes as set forth below.

**i.     The Purported "Offset" Relates to a Separate Investment Portfolio Involving Neither Petitioners Nor Debtor, Thus Failing to Establish a Bona Fide Dispute.**

The purported "offset" cannot create a bona fide dispute over Alleged Debtor's nonpayment of Notes because (i) of lack of mutuality between Alleged Debtor and Cithara-Bosideng with respect to the claims held by Cithara-Bosideng and purportedly held by the Alleged

17

Debtor in connection with a different segregated portfolio; and (ii) the HK Proceeding arises from a transaction that is separate from the Petitioning Creditors' acquisition of Alleged Debtor's Notes.

At the outset, the lack of mutuality among the purported debt held by Alleged Debtor and Cithara-Bosideng's claim against Alleged Debtor defeats the attempt to set off. Mutuality of debts is an essential element of offset, and it only exists between the same parties, standing in the same capacity. *See*, *e.g.*, *In re Lehman Bros. Inc.*, 458 B.R. 134, 137, 140 (Bankr. S.D.N.Y. 2011) ("To be eligible for setoff . . . the debtor's claim against the creditor and the debt owed the creditor must be mutual . . . courts consistently find debts to be mutual only when they are 'in the same right and between the same parties, standing in the same capacity.'"); *In re Arcapita Bank B.S.C.(c)*, 628 B.R. 414, 434-35 (Bankr. S.D.N.Y. 2021) ("'mutuality is strictly construed against the party seeking setoff'"). Here, the debt underlying the Petition is held by Petitioners against Alleged Debtor, while the alleged debt subject to the HK Writ is held by third-party Valuable Capital against a segregated portfolio that does not hold the Notes. This is because the Series 3 Subscription Agreement upon which the purported HK Writ is based was entered into, and executed by, Valuable Capital, and not Alleged Debtor. Ex. 10 at CITHARA0000011. It is undisputed that Alleged Debtor is *not* a party to the Series 3 Subscription Agreement and, as a result, lacks standing to sue Series 3 SP (or any other Cithara party).

Moreover, Alleged Debtor's own documents establish that Valuable Capital executed the subscription agreement on behalf of XRE rather than Alleged Debtor. Ex. 11 (XINDEBTOR00000001 at 013-14); *see also* Ex. 12 ¶ 6 (HK Writ). The fact that Alleged Debtor provided the funds to XRE is immaterial. To the extent Alleged Debtor signed any document, it did so only as the authorized signatory of XRE. Ex. 39 (XINDEBTOR00000261 at 269). Critically, however, Alleged Debtor does not even possess executed contracts bearing seals and/or signatures

18

of Alleged Debtor or XRE and Series 3 SP. Ex. 11 (XINDEBTOR00000001 at 003).[8] In short, any

claim Valuable Capital may have under the Series 3 Subscription Agreement cannot serve as an

offset of Petitioners' claims against Alleged Debtor for nonpayment of the Notes.

The fact that the HK Proceeding claims cannot serve as offsets as they arise from an

independent transaction is evident from the legal structure and express contract terms governing

the Series 3 SP investment. As a matter of law, a segregated portfolio is immune from claims

arising from a different portfolio unless intervention by outside investors is expressly authorized.

The Offering Memorandum provides, in pertinent part, that:

> Segregated Portfolios have the benefit of statutory segregation under Cayman
> Islands law so that the assets and liabilities of each Segregated Portfolio of the Fund
> are entirely segregated from the assets and liabilities of any other Segregated
> Portfolios of the Fund. The principal advantage of this is that the assets of one
> Segregated Portfolio are protected from the liabilities of the others. Where a
> liability of the Fund to a person arises from a matter, or is otherwise imposed, in
> respect of or attributable to a particular Segregated Portfolio such liability shall
> extend only to, and that person shall, in respect of that liability, be entitled to have
> recourse only to the assets of the Fund attributable to that Segregated Portfolio….
> As a matter of Cayman Islands law assets attributable to each Segregated Portfolio
> of the Fund shall only be available to creditors in respect of that Segregated
> Portfolio and the assets of that Segregated Portfolio shall be protected from
> creditors of the Fund who are not creditors in respect of that Segregated Portfolio.

Ex. 7 at CITHARA0000110; *see also* Ex. 10 at CITHARA0000003 (Series 3 Subscription

Agreement) (identifying Series 3 SP as a Segregated Portfolio); Ex. 8 at CITHARA0003349

(Bosideng SP Subscription Agreement) (same); *see also In re Refco Inc. Sec. Litig.*, 2013 WL

12158585, at *17 (S.D.N.Y. July 10, 2013) (acknowledging that the structure of segregated

portfolios under Cayman Islands law "is one of ringfencing" that protects each portfolio from

"cross-liability" and "the risk of loss of other portfolios"). Thus, the assets of investors in one

portfolio are effectively placed in a silo that is not accessible to claims arising from losses by

---

[8] Alleged Debtor's Chairman testified that he has not seen any inaccurate audit reports issued by the company's
audit department.  Ex. 24 (Y. Zhang Dep. Tr. at 66:4-9).

investors in other segregated portfolios.

Further, neither the Series 3 Subscription Agreement nor the Offering Memorandum for the investment grant permission to the third-party investor, Valuable Capital, to invade the separate Bosideng SP portfolio so as to suggest that a Series 3 SP investor has cross-portfolio recourse or that the transactions are effectively part of one agreement. The Bosideng SP agreements contain identical insulating provisions. Ex. 8 (Bosideng SP Subscription Agreement); Ex. 9 (Bosideng SP Supplemental Offering Memorandum). Thus, the governing agreements maintain the Cayman law prohibition on cross-portfolio claims. *See*, *infra*, § II(c)(iv).

Under these circumstances, it is clear that the Alleged Debtor's HK Proceeding relates to a separate transaction and does not create a bona fide dispute concerning the claims that underlie the Petition. As such, the counterclaims have no effect on the otherwise undisputed claims of Cithara-Bodiseng. *See In re Manolo*, 619 B.R. at 93 (holding that the petitioners' claims arose from two separate transactions evidenced by two unpaid invoices and that as one of the transactions was undisputed, the petitioner was eligible to file); *see also In re Euro-American Lodging Corp.*, 357 B.R. 700, 712 n.8 (Bankr. S.D.N.Y. 2007) ("a dispute as to the amount of the claim gives rise to a bona fide dispute only when (1) it does not arise from a wholly separate transaction and (2) netting out the claims of the debtors could take the petitioning creditors below the amount threshold of § 303" (quoting *In re Focus Media, Inc.*, 378 F.3d 916, 926 (9th Cir. 2004)).

*In re Seko Inv., Inc.*, 156 F.3d 1005, 1008-1010 (9th Cir. 1998) is particularly instructive. There, the alleged debtor failed to repay bonds and asserted unrelated offsetting counterclaims relating to a title insurance policy, arguing a bona fide dispute that offset the creditor's claims on the bonds. *Id.* at 1007. The court rejected the alleged debtor's argument and held:

> Whether or not it held good title to the land is irrelevant to its obligation to repay the money. Even though the failure of Seko's title caused Chicago Title to pay the

20

lenders' claims under their separate title insurance policies, leading to Chicago Title's acquisition of the notes, *this doesn't make the lenders' claims on these notes a loss caused by title defects vis-à-vis Seko; they existed because Seko received money and subsequently failed to pay it back as promised.* If Seko believes it has a meritorious claim under its policy of title insurance it could certainly bring that claim against Chicago Title. *But doing so wouldn't dispute the validity of Chicago Title's claim under the notes.*

*Id.* at 1009 (emphasis added).[9] The facts here are analogous and lead to the same conclusion that any claims concerning Valuable Capital's subscription to Series 3 SP do not create a dispute over the validity or amount of the Petitioning Creditors' claims for nonpayment of the Notes.

### ii.    The HK Proceeding Is Objectively Meritless.

The HK Proceeding is objectively meritless as it is nothing more than a last-ditch attempt to defend against its impending involuntary bankruptcy.

First, the timing of the HK Proceeding is highly suspicious given that the Alleged Debtor requested an extension of the original May 11, 2026 expert report deadline to May 14, 2026. This request evidently was a strategic decision to permit it sufficient time to concoct a frivolous lawsuit, one submitted via the HK Writ to the Hong Kong courts on May 14, 2026—the very same day that the expert reports were due in this proceeding. Notably, it was also submitted by the same individual who provided a May 14, 2026 declaration here: Chan King Wong Johnny.[10]

Second, the filing does not automatically create a bona fide dispute. "[T]he fact that there is a pending litigation between the parties is not dispositive and courts must still determine *whether*

---

[9] Although *In re Seko* was decided before the 2005 amendment to Section 303, the holding remains good law and has been followed by other courts. *See*, *e.g.*, *In re Honolulu Afford. Housing Partners, LLC*, 2015 WL 2203473, at *1, *5 (D. Haw. May 7, 2015) (agreeing with the creditor that "unrelated counterclaims do not raise a bona fide dispute about the creditor's claims" because "a debtor can not create a bona fide dispute about a creditor's claim by asserting an unrelated counterclaim against the creditor" but ultimately finding a bona fide dispute under the specific facts of that case because they arose from the same transaction); *In re Hentges*, 350 B.R. 586, 600-02 (Bankr. N.D. Okla. 2006) (holding no bona fide dispute existed because, *inter alia*, the alleged debtor's "potential judgment against [the petitioning creditor] in a wholly separate lawsuit [did] not affect the *amount* of [the petitioning creditor's] judgment" and liability was not at issue because alleged debtor confessed to same) (emphasis in original).

[10] Despite the Series 3 SP NAV falling to zero in July 2023, the Alleged Debtor did not attempt to enforce its purported claims until a few weeks ago.

21

there is an objective basis for the dispute based on the evidence presented." *In re ArtiusID, Inc.*, 673 B.R. 340, 361 (Bankr. W.D. Tex. 2024); *see also In re 35th & Morgan Dev. Corp.*, 510 B.R. 832, 846 (Bankr. N.D. Ill. 2014) ("mere existence of pending litigation or the filing of an answer is insufficient to establish the existence of a bona fide dispute") (citations omitted).

*In re ArtiusID, Inc.* is instructive. There, the court held that, notwithstanding the existence of a state court proceeding, no dispute existed because it had "no rulings from the state court that would support the existence of a bona fide dispute" as it was in its "nascent state" and that the alleged debtor failed to provide objective evidence of a dispute notwithstanding its ample opportunity to do so. *In re ArtiusID, Inc.*, 673 B.R. at 365. Indeed, where a petitioning creditor's affirmative claims are undisputed, asserted but unresolved non-bankruptcy court counterclaims and defenses that are not reduced to a sum certain do not establish grounds for a bona fide dispute. *See In re Naturescape Holding Group Int'l Inc.*, 2018 WL 650198, at *9 (D. Haw. Jan. 31, 2018) (state court summary judgment on claims notwithstanding alleged debtor's pending unadjudicated affirmative defenses renders petitioner's claim undisputed as to liability and amount).

Here, Alleged Debtor raises no challenge to the liability, amount and non-payment of Petitioners' claims, including Cithara-Bosideng, let alone a bona fide dispute. Instead, Alleged Debtor merely provides a purported writ for "counterclaims" relating to an entirely separate transaction between different parties. Alleged Debtor's apparent theory is that the nascent unrelated case should be treated as sufficient for a bona fide dispute to exist because it might ultimately result in a judgment in an amount large enough to offset one creditor's undisputed claim. Such arguments do not satisfy the objective test and should be rejected.

Third, the HK Proceeding is procedurally defective. Under the Rules of the High Court (Chapter 4A of the Laws of Hong Kong), the HK Proceeding has not been properly commenced

22

because (i) the HK Writ had not been stamped with the seal of the High Court of Hong Kong and (ii) the purported defendants have not been formally served with the HK Writ. Ex. 27 (Jiang Decl.) ¶¶ 9, 12. Unless and until both occur, no proceedings have been issued against the named defendants. *Id.* at ¶¶ 10-11, 15.

Finally, even if properly commenced, the substantive claims are factually and legally deficient and thus, clearly fail to satisfy the objective test. *See supra* at p. 17. As alleged in the HK Writ, Alleged Debtor claims it is entitled to a "rebate" under Valuable Capital's Series 3 Subscription Agreement, which it characterizes as the "excess" between the nominal interest on the notes for which Valuable Capital subscribed and the alleged interest payable on a $40 million loan. Ex. 12 at ¶ 5 (HK Writ). This claim is based on purported oral "representations" that were made to Alleged Debtor by named defendants. *Id.* at ¶ 6. However, nothing in the Series 3 Subscription Agreement or the Offering Memorandum entitles Alleged Debtor to a "rebate", and the Series 3 Subscription Agreement contains a non-reliance provision such that Alleged Debtor's supposed reliance on oral representations concerning a rebate is irrelevant. It states, in pertinent part, that "the Subscriber"—*i.e.*, Valuable Capital— "has not relied on any representation or other information purported to be given on behalf of the Fund except as set forth in the Offering Memorandum or the published, financial accounts of the Fund." Ex. 10 at -0000007 (Section 17(a)). Because its supposed entitlement to a rebate is not recorded in the Series 3 Subscription Agreement (or other governing Series 3 SP investment documents), Alleged Debtor has no contractual claim. Ex. 27 (Jiang Decl.) ¶¶ 23-24.

The Alleged Debtor's claim that it is entitled to a return of all of Valuable Capital's investments in Series 3 SP is similarly contradicted by the governing documents. That claim appears to seek recovery of the full investment amount paid by Alleged Debtor for Valuable

Capital's Series 3 SP investment irrespective of fund performance. Ex. 12 at ¶¶ 7-14 (HK Writ). But the governing documents *do not* guarantee a return of investment. Instead, they contained abundant risk disclosures, including the risk of complete loss of investment, concentration risk, leverage risk, and risk associated with economic and business conditions, among others. Ex. 7 at CITHARA0000131-0000140 (Offering Memorandum). In fact, the Offering Memorandum expressly states that Series 3 SP "is an enterprise with no operating history" and investments in it "entail[] a high degree of risk" with "a possibility that an investor could suffer a *substantial or even a complete loss of his investment* in the Fund." *Id.* at CITHARA0000131 (emphasis added). Moreover, Valuable Capital expressly represented in the Series 3 Subscription Agreement that it possessed the requisite knowledge to evaluate risks associated with investing in Series 3 SP "including without limitation, the ability to suffer a complete loss of the investment." Ex. 10 at CITHARA0000007 (Series 3 Subscription Agreement).

The Offering Memorandum also grants the investment manager discretion to buy and sell bonds and use securities in the fund as collateral for borrowing. Ex. 7 at 0000112, 0000114 (Offering Memorandum). The value of Valuable Capital shares is governed by the net asset value ("NAV") provisions. The redemption price for Series 3 SP shares is equal to the NAV per share on the day immediately preceding the day that redemption is sought. *Id.* at 0000103, 0000113. Due to defaults on the Alleged Debtor's own bonds, the NAV for the Valuable Capital bonds went down to zero in July 2023. *See* Ex. 14 (CITHARA0000003290). Valuable Capital is only entitled to the NAV of its shares—not a return of its investment as if it was risk-free. Furthermore, the mere fact that Series 3 SP exercised its discretion as the investment manager to buy and sell bonds and use securities as collateral for borrowing, including in circumstances where the value of the collateral had deteriorated, does not itself establish any breach of fiduciary duty, breach of contract

or actionable wrong under Hong Kong law. Ex. 27 (Jiang Decl.) ¶ 27.

In sum, the HK Proceeding lacks any merit and was filed to try to manufacture a dispute. The facts like those surrounding the HK Proceeding have caused courts to "reject any idea that the mere pendency of a lawsuit relative to a petitioner's claim creates a bona fide dispute" because the "adoption of such a per se rule would allow any debtor to avoid or defeat an involuntary petition simply through engaging in litigation." *In re Ross*, 63 B.R. 951, 960 (Bankr. S.D.N.Y. 1986).

### D. The Fourth and Fifth Affirmative Defenses Lack Any Support.

The Fourth Affirmative Defense is a boilerplate defense asserting laches, waiver and estoppel, and Alleged Debtor offers no factual nor legal support for them. Finally, Alleged Debtor's Fifth Affirmative Defense ("Petitioning Creditors do not satisfy the requisite threshold under 11 U.S.C. § 303(b)(1)") is without merit because, as demonstrated above, discovery confirms that Petitioners satisfy the requirements under 11 U.S.C. § 303(b)(1). *See supra* at p. 13.

### CONCLUSION

For the foregoing reasons, the Petitioning Creditors respectfully request that the Court enter an Order for Relief against the Alleged Debtor.

Dated:  June 15, 2026
    New York, New York

/s/ *Paul R. DeFilippo*
**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo
James N. Lawlor
Ryan A. Kane
Alexandra C. Spina
Nicholas A. Servider
500 Fifth Avenue
New York, NY 10110
Telephone:  (212) 382-3300
Facsimile:  (212) 382-0050
Email:  pdefilippo@wmd-law.com
      jlawlor@wmd-law.com
      rkane@wmd-law.com

25

aspina@wmd-law.com
nservider@wmd-law.com

*Counsel to Cithara Global Multi-Strategy SPC - Bosideng Industry Investment Fund SP, Star Freight & Trading Co., Limited, and Mars Partner Limited.*